IN THE SUPREME COURT OF THE STATE OF DELAWARE

<table>
<tr><td>BLUE BEACH BUNGALOWS DE, LLC,</td><td>§</td><td></td></tr>
<tr><td></td><td>§</td><td>No. 14, 2025</td></tr>
<tr><td>Appellant Below,</td><td>§</td><td></td></tr>
<tr><td>Appellant/Cross-Appellee,</td><td>§</td><td>Court Below—Superior Court</td></tr>
<tr><td></td><td>§</td><td>of the State of Delaware</td></tr>
<tr><td>v.</td><td>§</td><td></td></tr>
<tr><td></td><td>§</td><td>C.A. No. S24A-04-001</td></tr>
<tr><td>STATE OF DELAWARE,</td><td>§</td><td></td></tr>
<tr><td></td><td>§</td><td></td></tr>
<tr><td>Appellee Below,</td><td>§</td><td></td></tr>
<tr><td>Appellee/Cross-Appellant.</td><td>§</td><td></td></tr>
</table>

Submitted: October 8, 2025
Decided:    December 30, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED in part; REVERSED in part; and REMANDED.**

Stephen A. Spence, Esquire (*argued*), Victoria L. Braccini, Esquire, MELUNEY ALLEMAN & SPENCE, LLC, Lewes, Delaware for Appellant/Cross-Appellee.

Brian Canfield, Esquire, Ian Liston, Esquire (*argued*), Owen Lefkon, Esquire, Marion Quirk, Esquire, Michael Clarke, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware for Appellee/Cross-Appellant.

**VALIHURA**, Justice:

*INTRODUCTION*

This is an appeal and cross-appeal of the Superior Court's review of an administrative action initiated by Appellee, and Cross-Appellant, the Delaware Department of Justice Consumer Protection Unit ("DOJ"). An administrative Hearing Officer (the "Hearing Officer") imposed certain penalties on Appellant, and Cross-Appellee, Blue Beach Bungalows DE, LLC ("Blue Beach"). Blue Beach became interested in Pine Haven, a manufactured home and recreational vehicle community in Lincoln, Delaware, and entered into a purchase agreement with its longtime owner, Dale Cohee, in March of 2022. Thereafter, Blue Beach sent a barrage of letters to the residents of Pine Haven over the course of the next several months. These letters varied in content and tone but generally announced to residents that they had three-year seasonal lot licenses, that they possessed revocable guest licenses, and that they had month-to-month rental agreements. The letters threatened many that they could become holdover tenants and criminal trespassers who would be subject to police action, eviction, and property destruction or disposal. Residents were also given numerous, shifting deadlines to move out.

Blue Beach's tactics were not well received by Pine Haven residents, who eventually complained to the DOJ. The DOJ initiated an administrative enforcement action against Blue Beach for several purported violations of multiple statutes. Relevant to this appeal are certain charged violations of the Consumer Fraud Act ("CFA"). As to those, the DOJ alleged that Blue Beach made false or misleading statements about the seasonal nature of residents' living arrangements at Pine Haven and solicited illegally high rent payments. After a four-day hearing, the Hearing Officer issued an opinion largely in favor of the DOJ

2

and penalized Blue Beach over $700,000 for various statutory violations. Blue Beach appealed several aspects of that decision to the Superior Court, which affirmed some violations and vacated others. Both parties now contest certain decisions of the Superior Court.

On appeal, Blue Beach challenges two of the Superior Court's rulings. First, the Superior Court determined that Blue Beach's statements to Pine Haven residents fall within the scope of communications protected by the CFA. Blue Beach argues that they do not. It asserts that the CFA, which prohibits misleading statements "in connection with the sale, lease, receipt, or advertisement of any merchandise [,]" categorically does not apply to any communications concerning the underlying transaction after it has taken place. We agree. The plain language of 6 *Del. C.* § 2513(a) demonstrates that the CFA does not apply to post-transaction communications. This interpretation is further supported by a long line of Delaware law and is not disturbed by the General Assembly's recent amendment to the statute adding the word "receipt." Accordingly, we **REVERSE** the Superior Court as to that matter.

We leave to the Hearing Officer to resolve on remand the matter of conclusively determining whether Blue Beach's contested communications occurred after Pine Haven residents entered into their living-arrangement agreements, but based upon the record before us, we strongly suspect they did. If so, these communications do not fall under the CFA.

Second, the Superior Court held that the CFA was constitutional. Blue Beach appeals, arguing that the CFA, which allows for the administrative adjudication of

3

violations within its ambit, offends Article I, Section 4 of the Delaware Constitution ("Section Four") in that it unconstitutionally denies Blue Beach the right to a trial by jury. We disagree. In the context of statutory causes of action, Section Four only provides for the right to a jury trial where the action is sufficiently analogous to a historic cause of action entitled to a jury at common law. We hold Section 2513 of the CFA is not sufficiently analogous to its closest common law comparator, common law fraud. Accordingly, it does not fall within the Delaware Constitution's jury trial guarantee. Therefore, we **AFFIRM** the Superior Court on that matter.

On cross-appeal, the DOJ challenges the Superior Court's vacation of penalties as to certain, specific findings by the Hearing Officer. The communications challenged in this cross-appeal are within our holding on the scope of the CFA. Therefore, those issues appear to us to be moot, and we decline to address them here.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      *Pine Haven Before Blue Beach*

Pine Haven is a community located in Lincoln, Delaware.[1]  Prior to its acquisition by Blue Beach,[2] it was owned by Dale Cohee, who inherited the property from his father

---

[1] App. to Appellant, Cross-Appellee's Opening Br. [hereinafter A_ ]  at 832 (Commercial Real Estate Purchase Agreement Dated Mar. 28, 2022 [hereinafter Purchase Agreement]).

[2] Blue Beach Bungalows DE, LLC ("Blue Beach") is a subsidiary of BURCOR, LLC, which is itself related to Blue Water Development Corporation.  A737 (Tr. of Admin. Hearing of Sept. 14, 2023 [hereinafter Tr. of Admin. Hearing Day 3]).  The remainder of the facts concerning the background of Pine Haven and Blue Beach are taken primarily from the transcripts of the Administrative Hearing, the pertinent documents themselves, and the opinion below, unless otherwise noted.

and lived there himself for some years.[3] The property began as a wild animal park.[4] When that went bankrupt, Cohee's father converted the property to accommodate manufactured homes on a permanent basis. At some point years in the past, Cohee and his family installed the infrastructure to quarter recreational vehicles ("RVs").

By 2022, the year Blue Beach began to show interest, the status of the living arrangements of residents at Pine Haven was muddled. Cohee explained that Pine Haven residents were technically subject to a combination of seasonal and year-round arrangements. The extent to which someone lived at Pine Haven throughout the year ostensibly depended on what type of residence they had (manufactured home or RV) but was, in practice, also based on their personal circumstances. Cohee explained that "[t]here was a [manufactured home][5] section, and then the RV section was around it. . . . The mobile homes were year round[.] The [RV] part was supposed to be all seasonal, but I had older people on disability or Social Security who were living there year-round when I sold it."[6] By Cohee's reckoning, out of 160 RV lots, roughly 100 of them were being used seasonally, while about 40 were being used year-round even though they were technically seasonal.[7]

---

[3] A666 (Tr. of Admin. Hearing of Sept. 11, 2023 [hereinafter Tr. of Admin. Hearing Day 1]).

[4] *Id.*

[5] Cohee often referred to the manufactured homes as "mobile homes" but clarified that he meant the former when referring to the latter. A666 (Tr. of Admin Hearing Day 1).

[6] *Id.* Cohee stated several times throughout his testimony that he considered the manufactured homes part of Pine Haven to be year-round and the RV part to be seasonal. At one point he repeated this fact to Emily Demarco, Blue Beach's due diligence officer, after she stated that all sites were seasonal. A671 (Tr. of Admin Hearing Day 1).

[7] A672 (Tr. of Admin. Hearing Day 1). These figures represent Cohee's own rough estimation, but they at least provide good insight into the general proportion of year-round residents. The actual figures from the Purchase Agreement cite 160 RV sites, plus 10 licensed but unimproved additional

The remainder of the RV lots were uninhabited. Most of the *de facto* year-round RV inhabitants were older residents living on fixed incomes who Cohee surmised could not afford to live elsewhere.[8] Of the RV residents who were, in fact, staying seasonally, they were permitted to remain at Pine Haven for an eight-month span from April 15th to October 15th.

It appears that the ambiguity of the situation greatly stemmed from the fact that Cohee kept no written leases defining the nature of his residents' tenancy at Pine Haven.[9] Cohee described the arrangement as month-to-month.[10] In his view, the system worked, and he "didn't have any problems with anybody."[11] He claimed to be, until recently, unaware of any legal requirement that landlords have written leases with tenants.[12] Cohee had not even filled out a 2022 seasonal permit with the State and was eventually assisted in filing it by Blue Beach's due diligence officer, Emily DeMarco.[13] When confronted with the permit at the administrative hearing, Cohee maintained that the permit did not have any impact on whether he personally considered the community to be seasonal or year-round.

---

RV sites, and 29 separate and private mobile home sites. A832 (Purchase Agreement). The purchase agreement, however, does not specify or estimate who is year-round in fact or by right.

[8] *Id*. at A672.

[9] *Id*. at A673.

[10] *Id*.

[11] *Id*.

[12] *Id*. at A675.

[13] *See* A746 (Tr. of Admin Hearing Day 3).

He stated that it was "just something you filed every year for the RVs – for the seasonal part of the RVs."[14]

The Superior Court observed that the lack of documentation and ambiguous living arrangements at Pine Haven seemed, at least in part, due to Cohee's relationship with park residents. "Many of [Cohee's] decisions were motivated by his desire to accommodate the needs of the people in his park."[15] Cohee considered many of the residents to be his friends.[16] The rent costs themselves were "modest,"[17] and Cohee only charged $350 a month for year-round manufactured home residents, $500 a month for de-facto year-round RV residents,[18] and a once-per-year, $2,250 payment for truly seasonal RV residents.[19] As noted, Cohee repeatedly cited the financial and personal circumstances of his residents when explaining Pine Haven's tenancy situation, and when Cohee finally did decide to sell, he personally requested a clause in the Commercial Real Estate Purchase Agreement to ensure the residents of Pine Haven would be allowed to remain on the premises for at least three years or until their death, whichever happened first.[20] Cohee explained he did this because he wished to prevent his residents from being "thrown out on the street right away"

---

[14] A667 (Tr. of Admin. Hearing Day 1).

[15] *Blue Beach Bungalows DE, LLC v. Del. Dep't. of Justice Consumer Prot. Unit*, 2024 WL 4977006, at *1 (Del. Super. Dec. 4, 2024).

[16] A675 (Tr. of Admin Hearing Day 1).

[17] *Blue Beach*, 2024 WL 4977006, at *1.

[18] A671 (Tr. of Admin. Hearing Day 1). Cohee explained the difference in cost was because RV owners' utility costs were paid by him but incorporated into their rent, whereas manufactured-home residents paid utilities themselves. *Id*. at A672.

[19] *Id*. at A675.

[20] *Id*. at A668-69; A844 (Purchase Agreement, at § XXXV(2) "Additional Terms and Conditions").

by Blue Beach and to "give [residents] a chance to do something."[21]  Cohee's motivations notwithstanding, the fact remains that little was known about the tenancy status of Pine Haven residents.

### B. Blue Beach and Pine Haven

In March of 2022, Blue Beach, through a shell company called Rig Acquisitions, LLC, gained equitable title to Pine Haven Campground, LLC (the entity through which Cohee owned Pine Haven) after entering into a Commercial Real Estate Purchase Agreement.[22]  The agreement conveyed all leases, licenses, and agreements to Blue Beach as part of the sale.[23]  The purchase agreement remained executory until the delayed closing date of September 15, 2022, when Blue Beach took legal title to the premises.[24]

Both before and after the closing date of September 15, 2022, Blue Beach repeatedly contacted residents of Pine Haven.  The communications vary in tone, tack, and content, and sometimes contradict one another.  What is clear is that Blue Beach was trying to end its relationship with Pine Haven residents and get them off the premises.

Due to the "heavy-handed" approach of Blue Beach with these communications, "significant ill will" arose between Blue Beach and Pine Haven residents.[25]  Residents complained to the DOJ, and in response, the DOJ issued a Cease-and-Desist Order to Blue

---

[21] A669 (Tr. of Admin. Hearing Day 1).

[22] *See* A832 (Purchase Agreement).

[23] A848-854 (Bill of Sale.  Assignment And Assumption Dated Sept. 15, 2022).

[24] The closing was initially set for June 1, 2022, but was extended to September 15, 2022, because of a longer-than-expected due diligence process.  A745 (Tr. of Admin Hearing Day 3).

[25] *Blue Beach*, 2024 WL 4977006, at *1.

Beach on April 3, 2023. The order was directed to various statements Blue Beach made in communications with Pine Haven residents.[26] On the same day, the DOJ filed an administrative complaint (the "Complaint") against Blue Beach.[27]

The nature of these communications and how or whether the CFA applies to them comprise a substantial part of the parties' arguments on this appeal and cross-appeal. Blue Beach challenges findings concerning different communications under multiple grounds, creating a complicated web of arguments and counterarguments. At a minimum, Blue Beach broadly challenges findings concerning *all* communications by questioning the CFA's constitutionality. However, Blue Beach, more specifically, challenges some findings based on the scope of the CFA; some based on alleged errors by the Hearing Officer; some on both grounds; and some on neither (instead relying on its constitutional argument).

The exact relationship between certain communications and why Blue Beach challenges the findings pertaining to them is important to us because our holding regarding the CFA's scope requires new findings by the Hearing Officer and also likely moots the

---

[26] A174-75 (Summary Cease and Desist Order against Blue Beach, dated Apr. 3, 2023). The order prohibited Blue Beach from:

> (1) claiming the residents are licensees; (2) claiming that the community is and has been, seasonal; (3) threatening the residents with eviction in violation of Chapter 70 of Title 25 ("Chapter 70"); (4) threatening the residents with arrest and prosecution; (5) threatening to confiscate and destroy the residents' property; and (6) threatening the residents with illegal rent increases. *Id*.

It also prohibited "Threatening or attempting to evict tenants/residents, or raise their rent, in violation of Chapter 70." *Id*.

[27] A43 (DOJ's Administrative Complaint in the Matter of Blue Beach Bungalows DE, LLC, dated Apr. 3, 2023 [hereinafter DOJ Administrative Complaint] at 32).

cross-appeal issues.[28] We hold that the CFA does not cover post-transaction communications; however, both the Superior Court and Hearing Officer held that it did.[29] As a result, there are no explicit findings of fact determining which of Blue Beach's communications with Pine Haven residents are post-transactional because, given those tribunals' understanding of the law, that determination was not required. Although it seems likely that Blue Beach is correct that all but two communications are post-transactional and outside of the CFA's scope, the applicable standard of review gives us pause in finding as much.[30] Instead of us engaging in appellate-level fact-finding, we leave this task to the Hearing Officer on remand. Nonetheless, in the interest of providing some additional guidance on remand, we present the following accounting of the communications between Blue Beach and Pine Haven residents to help clarify how the parties do (or do not) challenge them. We begin with the communications implicated by our holding on scope.

*Communications Challenged Based on the Scope of the CFA*

On appeal, Blue Beach asserts that all but two communications fall outside the scope of the CFA because they contain communications made *after* the transaction creating the leases or licenses to which they pertain, and because they are clearly intended to end — not initiate or renew — any kind of occupancy arrangements with their recipients.[31]

---

[28] *See infra* Part III(C) (discussing cross-appeal).

[29] *See Blue Beach*, 2024 WL 4977006, at \*4 (affirming the hearing officer's finding that the CFA covered post-transaction communications).

[30] We further discuss the constraints of our standard of review in Part III(A), *infra.*

[31] Appellant/Cross-Appellee's Opening Br. [hereinafter Opening Br.] at 14.

First, there were two communications to Pine Haven residents who were living in RVs. Blue Beach argues that these communications fall outside the CFA's scope:

***JULY 18, 2022: First "Guest License" Revocation Notice to RV Residents:*** [32]

On July 18, Blue Beach sent a letter entitled "Notice of Revocation of Guest License – Effective October 31, 2022" (hereinafter "July 18 Guest License Revocation Notice") to the RV residents of Pine Haven.[33] This letter announced to RV residents that Pine Haven was not a year-round facility and that the legal relationship between Pine Haven and all its RV residents was that of licensor and licensee. It declared that the RV residents' current seasonal "guest license" ran only from April 15 to October 31, 2022 and was revocable at will by Pine Haven's new successor, Rig Acquisitions. It warned RV residents that Rig Acquisitions would revoke, not renew, residents' "guest license" on October 31, 2022. It concluded by threatening residents who did not vacate the premises that they would be criminal trespassers subject to police intervention and warned that their homes would be demolished and their personal property disposed of "with no right of recovery against Rig Acquisitions, LLC."[34]

---

[32] A816 (July 18, 2022 "Notice of Revocation of Guest License – Effective October 31, 2022" [hereinafter July 18 Guest License Revocation Notice]). Blue Beach also sent this letter to one manufactured-home resident. A648-49 (Tr. of Admin. Hearing Day 1).

[33] *Id.*

[34] *Id.*

- ***FEB. 23 2023: Second Guest License Revocation Notice to RV Residents:**[35]*

On February 23, 2023, Blue Beach sent a letter entitled "Notice of Revocation of Guest License – Effective March 15, 2023" to RV residents.[36] This letter contained substantially the same statements as the July 18 Guest License Revocation Notice, this time demanding departure by March 15, 2023. It included the same threats of property disposal and legal and police action.

* * *

Second, there were four communications sent to residents living in manufactured homes[37] that Blue Beach argues fall outside the CFA's scope:

- ***JUNE 30, 2022: 60-Day Termination Notice to Manufactured-Home Residents:**[38]*

On June 30, Blue Beach communicated with manufactured-home residents through Cohee's company in a letter entitled "60 Day Termination/non-renewal notice" ("60-Day Termination Notice").[39] The letter informed Pine Haven residents living in manufactured home units that their "month-to-month rental agreement for the Site [would] not be renewed and [would] therefore be terminated effective August 31, 2022[.]" The letter

---

[35] A905 (Feb. 23, 2023, "Notice of Revocation of Guest License – Effective March 15, 2023").

[36] *Id*.

[37] Although included below, we note that the March 7, 2023: Move Out Incentive Letter was sent to all residents and not just manufactured-home residents. *See* A581 (Post-Hearing Opinion and Order in the Matter of Blue Beach Bungalows DE, LLC [hereinafter Administrative Opinion] at 28).

[38] A830 (June 30, 2022 "60 Day Termination/non-renewal notice" [hereinafter 60-Day Termination Notice]).

[39] *Id*.

12

further threatened residents with a summary possession action should they not vacate their rental unit on or before August 31, 2022, and warned them that, pursuant to Section 5515 of the Residential Landlord-Tenant Code,[40] holdover tenants would be charged with double rent, measured *per diem*, for every day they remained after August 31, 2022.

- *FEB. 23, 2023: One Year Rental Agreement Termination Notice for Manufactured-Home Residents*:[41]

On February 23, 2023, Blue Beach sent two separate letters. The first was sent to RV residents and was entitled "Notice of Revocation of Guest License – Effective March 15, 2023" and is discussed above. The second was entitled "One Year Notice of Termination of Your Rental Agreement" ("One Year Termination Notice") and was distributed to manufactured-home residents.[42] In the latter letter, Blue Beach proclaimed that it "has not and will not operate a manufactured home community at [Pine Haven] as it purchased a seasonal campground, which is permitted as a seasonal campground, and [which] Blue Beach Bungalows DE, LLC will only run as a seasonal campground." It stated that "[t]his is not a change of use, but it is an elimination of an illegal use." Notwithstanding this assertion, Blue Beach noted that it would provide a one-year notice period because entities such as the Community Legal Aid Society ("CLASI"), the Delaware Attorney General's Office, and the Delaware Relocation Trust Authority had

---

[40] 25 *Del. C.* § 5515.

[41] A884 (Feb. 23, 2023 "One Year Notice of Termination of Your Rental Agreement" [hereinafter One Year Termination Notice]).

[42] *Id.*

advised Blue Beach that such a period was necessary under 25 *Del. C.* § 7024.  Blue Beach

noted that it disputed these authorities but would nonetheless comply.[43]

- ***March 7, 2023:  Move Out Incentive Letter:*** [44]

On March 7, 2023, Blue Beach sent another letter to all Pine Haven residents.[45]  It

offered monetary incentives for residents to move out, measured on a decreasing basis

proportionate to how long it took residents to leave.  The letter once again stated that Pine

Haven was a seasonal campground.  In a paragraph addressing RV residents specifically,

the letter retracted the prior threats from the February 23 Guest License Revocation Notice,

which had threatened RV residents with court proceedings and police involvement in the

event of holdover.  The letter nonetheless emphasized the need for RV residents to leave as

soon as possible.

- ***Settlement Agreements:***

Blue Beach executed a Stipulation[46] and Settlement Agreement[47] with certain

residents around April of 2023 to end their landlord-tenant relationships.[48]  The settlement

---

[43] *Id.*  25 *Del. C.* § 7024 allows a landlord to terminate a rental agreement if the landlord intends to change the use of the community, provided they give one year notice of termination to tenants. *Id.*

[44] A914 (March 7, 2023 letter, opening with "Dear Resident").

[45] *See* A581 (Administrative Opinion at 28).

[46] A907 (Stipulated Agreement).

[47] A909 (Settlement Agreement).

[48] *See* A907 (Stipulated Agreement); A909 (Settlement Agreement).  The stipulation and settlement agreement which appears as an example in the record is between Blue Beach and a resident named William Constantino.  *Id.*

agreements again characterized Pine Haven as a seasonal campground[49] and generally set out the rights and obligations of the parties pertinent to the residents' departure.

\* \* \*

Finally, in both its argument at the administrative level[50] and its argument to the Superior Court,[51] Blue Beach challenged the DOJ's assertion that its (Blue Beach's) charge of increased rent payments was within the scope of the CFA. At both levels, the matter was disposed of on grounds other than scope because both forums held that the CFA applied to post-transaction communications.[52] Since we reverse that finding, the issue once again becomes live. We mention the rental payments in our accounting of the issues here because our holding on scope likely moots the alternative grounds the Superior Court found for vacating those penalties. The rental payments, like the other communications in this section, must also be re-evaluated on remand consistent with our holding.

---

[49] A909 (Settlement Agreement at 1).

[50] In its post-hearing briefing at the administrative level, Blue Beach specifies in a footnote that the rent collection communications are outside the scope of the CFA based on its (Blue Beach's) reading of the statute. *See* A424 (Blue Beach's Post-Hearing Opening Br. at 13 n.4.). Above the line, Blue Beach states that the only communications it concedes are *within* the CFA's scope are the September Three Year Seasonal Lot License communication and the September 15th "Hello" communication, which we discuss below.

[51] *See Blue Beach*, 2024 WL 4977006, at \*15 (reproducing Blue Beach's own tabulation of adverse findings and corresponding grounds for challenging those findings).

[52] *See Blue Beach*, 2024 WL 4977006, at \*4 (affirming the hearing officer's finding that the CFA covered post-transaction communications).

*Communications Challenged Only Constitutionally:*

There are two communications which Blue Beach concedes fall within the scope of the CFA. However, Blue Beach challenges those communications on constitutional grounds.[53]

- ***AUG.-SEPT., 2022: Three Year Seasonal Lot License to Manufactured-Home Residents:[54]***

From August to September,[55] in partial contradiction of the 60-Day Termination Notice previously sent, Blue Beach sent armed agents to distribute a "Three Year Seasonal Lot License" to the manufactured-home residents of Pine Haven.[56] The lot license raised rent by one hundred dollars a month and offered manufactured-home residents the option to occupy their homes as licensees from 2022 to 2025, but only on a seasonal basis between April 15 and October 31.[57] Blue Beach concedes that this communication falls within the scope of the CFA because it is intended to encourage recipients to enter into a new agreement with Blue Beach regarding their residency, but Blue Beach maintains its constitutional challenge.

---

[53] Opening Br. at 8 n.1, 20 n.6.

[54] A818 (Three Year Seasonal Lot License).

[55] *See* A691-92 (Tr. of Admin. Hearing on Sept. 13, 2023 [hereinafter Tr. of Admin. Hearing Day 2]).

[56] A0692 (Tr. of Admin. Hearing Day 2); A818 (Three Year Seasonal Lot License).

[57] A818 (Three Year Seasonal Lot License); A0693 (Tr. of Admin. Hearing Day 2).

- ***SEPT. 15, 2022: "Hello!" Letter to Manufactured-Home Residents:***[58]

On September 15th, the deal between Blue Beach and Pine Haven, LLC closed and Blue Beach gained legal title to Pine Haven.[59] On the same day, Blue Beach sent another letter to the manufactured-home residents.[60] The letter, entitled simply "Hello!", stated that Pine Haven was a seasonal community, that residents who thought otherwise were "misled," and that Pine Haven "simply is not [year-round]."[61] Notwithstanding this fact, Blue Beach acknowledged that many of the residents did not know of the seasonal nature of Pine Haven and would consequently "help to ease [them] through [the] transition back to seasonal" by not cutting off their utilities until November 15, 2025.[62] In the meantime, residents were to make their rent checks payable to "Blue Beach Bungalows DE" and send them next door to Jellystone Park.[63] Again, Blue Beach concedes that this communication falls within the scope of the CFA because it is intended to encourage residents to enter into new agreements, but Blue Beach maintains its constitutional challenge.

*Communications Implicated on Cross-Appeal*

On cross-appeal, the DOJ challenges the Superior Court's decision to vacate penalties awarded by the Hearing Officer because of certain communications between Blue

---

[58] A829 (Sept. 15, 2022 "Hello" Letter from Blue Beach to Pine Haven Residents [hereinafter Sept. 15, 2022 "Hello" Letter]).

[59] A921 (Special Warranty Deed dated Sept. 15, 2022).

[60] A829 (Sept. 15, 2022 letter beginning with "Hello!").

[61] *Id.*

[62] *Id.*

[63] *Id.*

17

Beach and Pine Haven residents.[64] The DOJ challenges the Superior Court's conclusions that the Hearing Officer erred in awarding penalties relating to these communications and also challenges the Superior Court's determination that certain factual findings were not supported by substantial evidence. These communications, summarized above, are: (i) the June 30, 2022 60-Day Termination Notice to Manufactured-Home Residents;[65] (ii) the July 18, 2022 First "Guest License" Revocation Notice to RV Residents";[66] and (iii) Rent Collection Activities by Blue Beach.

### C. The Administrative Action

Following the DOJ's Complaint, the Hearing Officer was appointed and a hearing was scheduled pursuant to 29 *Del. C.* § 2525(c) and 6 *Del. Admin. C.* § 103-25.1.3. In its complaint, the DOJ alleged that Blue Beach willfully violated 6 *Del. C.* § 2513 of the CFA in its statements to Pine Haven's Residents by: (1) falsely stating that Pine Haven was a seasonal property; (2) falsely stating that police would be involved and residents' property would be destroyed or disposed of if residents did not vacate by a certain date; and (3) falsely stating that residents were required to pay higher rent.[67]

The DOJ held the administrative hearing relating to these issues over the course of four days starting on September 11, 2023, and ending on September 15, 2023.[68] The

---

[64] The Superior Court's reasoning is discussed in greater detail in Part I(D).

[65] A830 (60-Day Termination Notice).

[66] A816 (July 18 Guest License Revocation Notice).

[67] *See* A32-35 (DOJ Administrative Complaint ¶¶ 69-86).

[68] A644-815 (encompassing the transcript of all days of the administrative hearing).

18

Hearing Officer released his decision on April 4, 2024 (the "Administrative Opinion").[69] The Hearing Officer made two preliminary findings regarding the CFA. First, he concluded that the litigation of the DOJ's CFA claims by means of an administrative proceeding did not violate Blue Beach's constitutional rights under Section Four.[70] Second, he found that the Blue Beach's communications with Pine Haven residents were within the scope of matters enforceable under the CFA.[71] Then, he ruled on specific alleged violations of the CFA by Blue Beach.

The first relevant violation concerned Blue Beach's June 30, 2022 60-Day Termination Notice (sent to manufactured-home residents) which threatened residents with lease termination and double rent for holdovers.[72] According to the Hearing Officer, because Blue Beach knew or should have known it did not yet own Pine Haven (the sale still being executory at this point) it was not party to the lease agreements referred to in the letter. The Hearing Officer found this to constitute two violations of 6 *Del. C.* § 2513, and he awarded a total of $5,000 ($2,500 for each violation).

The second relevant violation concerned Blue Beach's July 18, 2022 letter which was the first of two "Guest License" Revocation communications directed at RV residents. Again, the Hearing Officer found that, because Blue Beach knew or should have known it

---

[69] A554 (Administrative Opinion at 1).

[70] A593 (Administrative Opinion at 40). Section Four concerns an individual's right to a trial by jury and states that "[t]rial by jury shall be as heretofore." Del. Const. art. I, § 4. This Court will address the CFA's constitutionality under this Section in the discussion below.

[71] A598 (Administrative Opinion at 45).

[72] A606 (Administrative Opinion at 53); *See supra* Part I(B).

19

was not yet the owner of Pine Haven and could not revoke anything, this communication, which was sent to at least 25 residents (24 RV residents and at least 1 manufactured-home resident), constituted 25 violations of 6 *Del. C.* § 2513 for a total penalty of $62,500 ($2,500 for each violation).[73]

The third relevant violation concerned Blue Beach's Three-Year Seasonal Lot Licenses, distributed to 29 residents from August to September, 2022.[74] Again, the Hearing Officer found these to be violations not only because of Blue Beach's lack of ownership at the time, but also because Blue Beach knew the rent increase referred to within was prohibited under the Delaware Manufactured Homes and Manufactured Home Communities Act ("MHMHCA"). These communications constituted 29 violations of *Del. C.* § 2513 for a total of $72,500 ($2,500 each).

The last relevant violation concerned Blue Beach's February 23, 2023 communication, which was the second of two guest license revocations to RV residents.[75] The Hearing Officer found this to be a violation because it asserted that Pine Haven was a seasonal campground despite "extensive" communications between Blue Beach, the DOJ, the Community Legal Aid Society, the Delaware Manufactured Homes Ombudsperson, and the Delaware Manufactured Home Relocation Authority, which, the Hearing Officer found "unquestionably" placed Blue Beach on notice that Pine Haven was not seasonal.

---

[73] A606-07 (Administrative Opinion at 53-54).

[74] A607 (Administrative Opinion at 54).

[75] A610 (Administrative Opinion at 57).

This communication, sent to 24 residents, constituted 24 violations of the CFA for which the Hearing Officer penalized Blue Beach $84,000 ($3,500 for each violation).[76]

Blue Beach appealed the decision of the Hearing Officer to the Superior Court on April 22, 2024.

### D. The Superior Court's Opinion

In its review of the Administrative Opinion, the Superior Court made five determinations relevant to this appeal. First, the Superior Court addressed Blue Beach's argument that its communications with Pine Haven Residents were outside of the scope of the CFA, which it claimed only applies to pre-transaction communications. The Superior Court rejected this argument and found the challenged communications to be within the scope of the CFA. The Superior Court thought it salient that the CFA's language covered deceptive acts or omissions "*in connection with* the . . . *receipt* . . . of any merchandise."[77] Although Delaware cases touching on the temporal limitations of the CFA seemed to suggest that only pre-transaction conduct was covered, those cases did not, in the Superior Court's view, support that interpretation with any meaningful discussion. Moreover, those cases ignored the statute's own directive to be construed as liberally as possible.[78] Further, the Superior Court was persuaded by a decision by the United States District Court for the District of Delaware in *Lony v. E.I. du Pont de Nemours & Co.*,[79] in which the court held

---

[76] A611 (Administrative Opinion at 58).

[77] *Id*. (quoting 6 *Del. C.* § 2513(a)).

[78] *Id*. at *3-4 (citing 6 *Del. C.* § 2512).

[79] *Lony v. E.I. du Pont de Nemours & Co.,* 821 F. Supp. 956 (D. Del. 1993).

21

that an "after sale statement *may* be viewed as 'in connection with the sale of merchandise.'"[80] The Superior Court agreed with that interpretation, reasoning that issues arising after a transaction are "ubiquitous[,]" with many transactions having rights and obligations post-closing."[81] Moreover, the "in connection" language of the statute created a "broad mandate, rather than a limiting one[,]"[82] which led the court to ultimately conclude that no temporal limitation existed.[83]

The Superior Court next evaluated the Hearing Officer's determinations regarding the June 30, 2022 letter giving manufactured-home residents a 60-day "month-to-month" lease termination notice, and the July 18, 2022 letter to RV residents revoking their "guest license."[84] Both letters predated Blue Beach's closing on Pine Haven. As noted above, the Hearing Officer determined that these letters violated the CFA because Blue Beach was not yet the owner of Pine Haven.[85] Blue Beach contended that this determination was based upon a theory of law not charged by the DOJ. Moreover, Blue Beach argued that even if the Superior Court were to accept the Hearing Officer's uncharged findings, the equitable ownership that Blue Beach *did* have over Pine Haven during the executory period of the sales contract conferred upon it the authority to "take steps during the contract period to

---

[80] *Blue Beach*, 2024 WL 4977006, at *3 (emphasis added) (quoting *Lony*, 821 F. Supp. at 962).

[81] *Id*. at *4.

[82] *Id*.

[83] *Id*. ("I see no temporal limitations in the statutory language. I find it to be broad and not limiting.").

[84] *Id*.

[85] A606-07 (Administrative Opinion at 53-54).

prepare the community for transfer, and to take formal actions affecting the community and its residents."[86]  The Superior Court held that the Hearing Officer's findings regarding the June 30 and July 18 communications constituted legal error for (ostensibly) both reasons (that the theory was not charged and that Blue Beach did have the necessary power as equitable owner).

The Superior Court then addressed the matter of the collection of rent payments. The court noted that the Hearing Officer found "126 CFA violations and imposed a $126,000 penalty ($1,000 each) against Appellant for continuing to accept rent payments in excess of the amount permitted by the Manufactured Housing Act[.]"[87]  However, in the Superior Court's view, the DOJ charged Blue Beach with a wrongful act of commission, that is, actively soliciting tenants to pay excessive rent, rather than act of omission, which was passively accepting the excessive rent payments without correction.  Therefore, when the Hearing Officer based his penalty awards on all the instances where Blue Beach failed to correct overpaying residents, he erroneously based his decision on a theory not charged. The Superior Court agreed with Blue Beach and added that there was also insufficient evidence to conclude that Blue Beach communicated anything to its residents when they submitted monthly rent payments.  Therefore, there was no factual basis for the Hearing Officer to find that Blue Beach committed any affirmative acts of misrepresentation.

---

[86] *Id*. at *8.

[87] *Id*. at *5.

The Superior Court then analyzed the Hearing Officer's decision regarding the February 23, 2023 letter purporting to revoke RV residents guest licenses (again) and claiming Pine Haven was seasonal. He had found 24 violations of the CFA where the letter falsely claimed Pine Haven's seasonal nature. Blue Beach argued that this finding was against the weight of the evidence. The Superior Court agreed. The Hearing Officer found that the letter was sent to 24 residents. These 24 residents lived in structures that looked like RVs. However, the Hearing Officer had also held that, under the MHMHCA, an RV which is not mobile is considered a manufactured home. This created an additional inquiry: if a resident were in a mobile RV, then the representations of Pine Haven being seasonal *as to them* would not be false, but if a resident were in an immobile RV, it would be. Yet, the Hearing Officer never addressed this inquiry; he made no finding of fact as to how many of the 24 RVs who received the February 23 letter were mobile or immobile.[88] Therefore, the Superior Court determined that the Hearing Officer's findings that there were misrepresentations in violation of the CFA were not supported by substantial evidence.

Finally, the Superior Court addressed the constitutionality of the CFA under Section Four, which guarantees trial by jury in certain civil causes of action.[89] Blue Beach argued, drawing heavily on federal constitutional jurisprudence, that 6 *Del. C.* § 2513 fell under the scope of Section Four's protections because it was tantamount to a fraud action and sought damages at law. The Superior Court rejected Blue Beach's arguments. First, the

---

[88] *Id.*

[89] *Id.* at *13; *see* Del. Const. art. I, § 4.

24

court rejected Blue Beach's reliance upon federal Seventh Amendment analysis because the parties agreed that the United States Supreme Court "has never applied the Seventh Amendment to the States."[90]  Then, the Superior Court deconstructed Blue Beach's argument that the DOJ's claims were like common law fraud (which would receive a jury trial under Delaware law) relying mostly on an element-to-element comparison demonstrating that the CFA and common law fraud had substantially different requirements.

Blue Beach appeals the Superior Court's decisions regarding the scope and constitutionality of the CFA.  The DOJ cross-appeals the Superior Court's decision vacating penalties pertinent to the June 30 and July 18, 2022 letters, the collection of rent payments, and the February 23, 2023 letter.[91]

## II.  STANDARD OF REVIEW

"Our review of the [administrative hearing officer's] decision matches that of the Superior Court—whether the decision is supported by substantial evidence and is free from legal error."[92]  With respect to questions of statutory interpretation and constitutional law, this Court's review is *de novo*.[93]

---

[90] *Id*. at *13-14.

[91] *See* Cross-Appellant's Corrected Answering Br. on Appeal and Opening Br. on Cross-Appeal [hereinafter Opening Cross-Appeal Br.].

[92] *Keep Our Wells Clean v. Delaware Dep't of Nat. Res. & Env't Control*, 243 A.3d 441, 446 (Del. 2020).

[93] *Delaware Solid Waste Auth. v. Delaware Dep't of Nat. Res. & Env't Control*, 250 A.3d 94, 105 (Del. 2021).

## III.  ANALYSIS

### A.  The CFA Does Not Apply to Blue Beach's Post-Transaction Communications.

On appeal, Blue Beach argues that both the Hearing Officer and the Superior Court erred when they determined that the CFA applies to communications or interactions between a business and consumer that occur after a relevant transaction took place ("post-transaction communications").  Asserting the CFA does *not* apply to post-transaction communications, Blue Beach maintains that only two of its challenged communications are within of the scope of the CFA.  It argues that the CFA does not apply to all the other communications because they occurred after the resident's leases or licenses had already begun, and were designed to end those arrangements, not create new ones.  Although we decline to make findings on the nature of Blue Beach's specific communications (and leave that question to the Hearing Officer on remand), we do hold, based on the plain meaning of 6 *Del. C.* § 2513(a), that the CFA does not apply to post-transaction communications.  Our interpretation is supported not only by the statute's words, but also by decades of caselaw construing it that way.  Finally, neither the fact that some of Pine Haven residents' arrangements were leases, nor the General Assembly's 2021 addition of the word "receipt" to 6 *Del. C.* § 2513(a), alter this limitation on the CFA's scope as the DOJ asserts.

First, the text of 6 *Del. C.* § 2513(a) demonstrates that the CFA does not apply to post-transaction communications.  When evaluating the scope of a statute, this Court's

primary goal is to ascertain and give effect to the intent of the legislature.[94] The starting

point for this inquiry is the statute's plain language. 6 *Del. C.* § 2513(a) states:

> The act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, *in connection with the sale, lease, receipt, or advertisement* of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is an unlawful practice.[95]

We conclude that the part of the statute emphasized above limits the scope of the CFA,

confining its application to communications between businesses and consumers which

happen before a transaction or during the transaction itself. Put another way, it excludes

post-transaction communications from the scope of the CFA.

The CFA's definitions of "sale," "lease," and "advertisement support this reading.

The CFA defines "sale" as "any sale, offer for sale or attempt to sell any merchandise for

any consideration."[96] It defines "lease" as "any lease, offer to lease or attempt to lease any

merchandise for any consideration."[97] And it defines "advertisement" as "the attempt by

publication, dissemination, solicitation or circulation to induce, directly or indirectly, any

person to enter into any obligation to acquire any title or interest in, any merchandise."[98]

---

[94] *Judicial Watch, Inc. v. Univ. of Delaware*, 267 A.3d 996, 1003-04 (Del. 2021).

[95] 6 *Del. C.* § 2513(a) (emphasis added).

[96] 6 *Del. C.* § 2511(8).

[97] 6 *Del. C.* § 2511(3).

[98] 6 *Del. C.* § 2511(1). Although the parties do not dispute that real estate is covered under the CFA, we note that the statute's definition of "merchandise" includes "real estate." 6 *Del. C.* § 2511(6).

These definitions employ terms that describe a determinable, transactional event between a business and consumer, or types of communications in the lead-up to that event rather than after it. Consequently, it is plain that the CFA targets wrongful conduct aimed at inducing a consumer to engage in or consummate a transaction.[99]

The DOJ challenges this conclusion by relying on the phrase "in connection with" in the statutory language, which is indeed a "broad mandate."[100] But "in connection with" does not appear in a vacuum. It appears directly before "sale, lease, *etc.* . . . ." Thus, when read wholistically,[101] "in connection with" does not suggest that the CFA applies to all acts by the business that are in some way connected to its relationship with the consumer. Rather, it means that the CFA applies to acts or omissions in connection with the statute's

---

[99] Appellant, Cross-Appellee's Reply Br. on Appeal and Answering Br. on Cross-Appeal [hereinafter Reply Br.] at 9 (emphasis added).

[100] *Blue Beach*, 2024 WL 4977006, at *4 ("'In connection with' seems to me to be a broad mandate, rather than a limiting one."). Although authority specifically interpreting "in connection with" as it appears in the CFA is scarce, Delaware courts, as well as the U.S. Supreme Court, have noted the breadth of the term in similar, scope-probing interpretive contexts. *Lillis v. AT&T Corp.*, 904 A.2d 325, 332 (Del. Ch. 2006) (observing, in the context of contract interpretation, that the phrase "in connection with" is "broad," "sweeping[,]" and "necessarily encompassing[.]"); *Seritage Growth Props., L.P. v. Endurance Am. Ins. Co.,* 2022 WL 18046813, at *6 (Del. Super. Dec. 19, 2022) (same); *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002) (construing Section 10(b) of the Securities Exchange Act — which makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe[]" — and finding that "the SEC has consistently adopted a broad reading of the phrase 'in connection with the purchase or sale of any security.'").

[101] *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994) ("[when] the General Assembly pass[es] the pertinent statutes as a whole and not in parts or sections[,] . . . [e]ach part or section [of a statute] should be read in light of every other part or section to produce a harmonious whole."); 1 *Del. C.* § 303 ( "Words and phrases shall be read with their context[.]"); *In re Fox Corp./Snap Inc.,* 312 A.3d 636, 647 n.58 (Del. 2024) (stating words in a statute "must be interpreted in the context of words surrounding them." (quoting *Agar v. Judy*, 151 A.3d 456, 473 (Del. Ch. 2017))).

28

enumerated interaction types, and those enumerated interactions are, as explained, temporally limited by nature.  Therefore, we conclude that the inclusion of "in connection with" does not expand the CFA's scope to post-transaction communications.

Second, decades of Delaware case law support the view that the CFA does not encompass post-transaction communications.  In almost all of these cases, Delaware courts find that certain communications, which occurred after an underlying transaction took place, fell outside of the scope of the CFA.  Although some of these cases only lightly touch on the matter of scope as it relates to post-transaction communications, taken together, they are highly persuasive.

The first case addressing the scope of the CFA is *Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of N. Am., Inc.*[102]  In *Gershman's*, plaintiff purchased a vehicle from a dealership.  The vehicle suffered from several defects, including engine defects, requiring subsequent repair.[103]  In the course of multiple failed attempts to fix the vehicle, defendants "made fraudulent post-sale representations" to plaintiff, which plaintiff apparently "relied upon in not exercising its rights under the law."[104]  The dealership argued that the CFA "does not apply to post-sale representations[,]" and plaintiff argued that, by its own terms, the Act was to be "liberally construed[.]"[105]  The court agreed with the dealership, and stated that the language directing liberal construction was not a license to

---

[102] 558 A.2d 1066, 1074 (Del. Super. 1989), *aff'd*, 596 A.2d 1358 (Del. 1991).

[103] *Id*. at 1074.

[104] *Id*. at 1074.  *Gersman's* does not specify what these "fraudulent post-sale representations" were in substance, or what rights plaintiff abstained from exercising as a result.

[105] *Id*. (quoting 6 *Del. C*. § 2512).

29

ignore the "clear language of the statute which restricts its application to deceptive practices 'in connection with the sale or advertisement' of the merchandise."[106] The court continued that "[g]iven this statutory limitation, it is clear that post-sale representations which are not connected to the sale or advertisement of the [merchandise] do not constitute consumer fraud under the Act."[107]

Gershman's use of the phrase "post-sale representations which *are not* connected to the sale" gives us some pause. This language in *Gershman's* could lead one to speculate that post-sale representations that *are* somehow connected to the sale could be within the scope of the CFA. However, other cases demonstrate more clearly that the point of transaction is a critical "cut-off" moment for the CFA.

For example, in *Price v. State Farm Mut. Auto. Ins. Co.*, plaintiff alleged that his insurance company violated the CFA by subsequently interpreting unclear terms in his policy in a manner which caused them to become "deceptive."[108] Although the court dismissed the issue on other grounds,[109] it noted, in the alternative, that 6 *Del. C.* § 2513(a) would not apply because "it protects consumers who are deceived while purchasing merchandise [and not] customers who have purchased merchandise and are seeking to

---

[106] *Id*. (quoting 6 *Del*. *C*. § 2513(a)).

[107] *Id*.

[108] 2013 WL 1213292, at *11 (Del. Super. Mar. 15, 2013), *aff'd,* 77 A.3d 272 2013, WL 5178520 (Del. Sept. 13, 2013) (TABLE).

[109] The court observed that Section 2513(a) did not apply to "matters subject to the jurisdiction of the ... Insurance Commissioner of this State[,]" which was the case in *Price*. *Id*. at *10 (alteration in original) (quoting 6 *Del*. *C*. § 2513(b)(3)).

receive a benefit of that purchase."[110]  Because plaintiff's argument relied on deceptions

allegedly created by the insurer's interpretation and performance of the policy *after* he had

actually contracted for it,  plaintiff failed to "adduce any facts that [the insurer] employed

these allegedly deceptive practices 'with intent that others rely upon such concealment . . .

in connection with the sale, lease or advertisement of any merchandise.'"[111]

The Superior Court's earlier decision in *Lee ex rel. B.L. v. Picture People*, *Inc.* aligns

with this post-sale "cut-off" interpretation.[112]   There, plaintiff took her child to a

photography studio to acquire photos for personal, family use. [113]  At checkout, after the

photos had been taken, the photographer asked plaintiff to sign a consent form that would

allow it to use the photos in a contest for its (the photographer's) own  benefit.  Plaintiff

refused to sign the form.  Later, plaintiff discovered that the photographer had distributed

some of the photos to a daycare, which intended to use them for advertising purposes in

the future.[114]  Plaintiff filed a CFA claim against the photographer, and the photographer

moved to dismiss, asserting that both its disregard for the unsigned consent form and its

failure to inform plaintiff of the unauthorized use were not within the scope of the CFA.[115]

The Superior Court agreed, reasoning that the actual contract — *i.e.*, the agreement

containing the photographer's promise to take photos for plaintiff in exchange for

---

[110] *Id.*

[111] *Id.* (quoting 6 *Del. C.* § 2513(a)).

[112] 2012 WL 1415471 (Del. Super. Mar. 19, 2012).

[113] *Lee*, 2012 WL 1415471, at *1.

[114] *Id.*

[115] *Id.*

plaintiff's promise to pay — had already been entered into by the time the consent form was presented at checkout.[116] Therefore, both the consent form interaction and the subsequent failure to inform were "'post-sale' for the purposes of the Act[,]" and photographer's motion to dismiss was granted.[117]

Finally, we mention *Foraker v. Voshell*.[118] In *Foraker*, property owners contracted with a builder who was to build a custom home for them. Over the course of construction, several issues arose. The relationship ultimately fell apart and the builder stopped working on the project. A lawsuit ensued and the property owners asserted a counterclaim alleging that the builder violated the CFA by misrepresenting or omitting material facts concerning paying the subcontractors, the materials for the projects, false invoices, and orders to change the construction plan. The Superior Court dismissed the CFA claim, finding that all of the misrepresentations were in connection with aspects of the post-sale construction of the property owners' custom home and not the sale of services itself (or the advertisement thereof), which the court stated "was executed when the parties signed the Contract, which [occurred] over a year before the alleged misrepresentations."[119]

Blue Beach presents us with even more cases supporting its position that we merely take note of for brevity's sake.[120] Nevertheless, we believe that in those cases, as in the

---

[116] *Id*. at *9.

[117] *Lee*, 2012 WL 1415471, at *9.

[118] *Foraker v. Voshell*, 2022 WL 2452396 (Del. Super. July 1, 2022).

[119] *Id*. at *17.

[120] *See Thomas v. Harford Mut. Ins. Co.*, 2003 WL 220511, at *3-4 (Del. Super. Jan. 31, 2003), (finding that misrepresentations made by an injured worker's case manager concerning his workers' compensation policy were outside the scope of the CFA because they were made after

32

cases illustrated above, courts followed the understanding that the endpoint for the CFA was the formation of the agreement between the parties, and that post-transaction communications, including those in the course of performance, did not fall within the scope of the CFA.

The DOJ responds by emphasizing a sentence from the Delaware District Court's opinion in *Lony v. E.I. du Pont de Nemours & Co.*, which was also cited by the Superior Court in its ruling below.[121] Although *Lony* does state that "an after sale statement may be viewed as 'in connection with the sale of merchandise[,]'" it stands in the face of the numerous Delaware decisions to the contrary and is not binding on us. Further, a later opinion by the District Court, *Williams v. Progressive Direct Ins.*, without citing to *Lony*,

the sale or advertisement of the policy and because the case manager was not involved in that transaction (which was between the insurer and plaintiff's employer)), *mot. vacated in part*, 2003 WL 21742143 (Del. Super. July 25, 2003) (vacating grant of summary judgment for plaintiff's claim of intentional infliction of emotional distress); *Ayers v. Quillen*, 2004 WL 1965866, at *6 (Del. Super. June 30, 2004) (citing *Gershman's* and maintaining that post-transaction communications are not within the scope of the CFA; rejecting defendant's argument that an existing communication on defendant's website was excluded as post-transaction because plaintiff had only discovered it after the transaction had been made); *Dunfee v. Newark Shopping Ctr. Owner LLC*, 2016 WL 639556, at *4 (Del. Super. Feb. 16, 2016) (finding a roofing company's "concealment" of its failure to name a property owner as an insured under the roofing company's insurance policy to be outside of the CFA's scope, since this "concealment" began when the roofing company contracted with the insurer, which was *after* its initial contract with the property owner (the initial contract creating the duty to name the property owner)); *Olga J. Nowak Irrevocable Tr. v. Voya Fin., Inc*, 2020 WL 7181368, at *9 (Del. Super. Nov. 30, 2020) (citing *Price* and holding that the CFA did not confer a private cause of action against insurance companies, but observing that even if it did, misleading illustrations by defendant about plaintiff's insurance policy could not support a claim under the CFA because they occurred after the sale of the insurance policy.), *aff'd,* 256 A.3d 207, 2021 WL 2815225 (Del. July 7, 2021) (TABLE).

[121] *Blue Beach*, 2024 WL 4977006, at *4 (quoting 821 F. Supp. at 962).

aligns with the direction of the cases discussed above.[122] Therefore, we do not afford great weight to *Lony* and are not persuaded to follow it.

The DOJ's second counterargument is to point out that some Pine Haven residents had leases, and that a lease, being an ongoing relationship, is distinguishable from a sale, which "occur[s] at single point in time." [123] Observing that the cases above all involved sales, the DOJ asserts that they are inapposite. The DOJ's argument is incorrect for two reasons. First, the reasoning in the cases above is not inextricably tied to sales. Instead, the cases above stand for the proposition that the CFA extends as far as the formation of the underlying agreement, whatever type it may be, and *not* beyond that point.[124] A lease,

---

[122] *Williams v. Progressive Direct Ins. Co.*, 631 F.Supp.3d 202, 212 (D. Del. 2022). In *Williams*, plaintiff alleged that defendant, her car insurer, violated the CFA when it used a certain, purportedly unfair, methodology to calculate the value of her car to compensate her after her car was totaled. *Id.* at 205-06. The thrust of plaintiff's argument was that the defendant's post-sale application of the allegedly faulty valuation method was evidence of fraud regarding defendant's representations when selling her the policy, which stated that defendant would ensure her car up to its "actual cash value." *Id.* at 209. It was plaintiff's position that the methodology used did not reflect such a value. *Id.* The court rejected this argument and found that any issues with defendant insurer's post-sale construction and application of plaintiff's policy fell outside of the scope of the CFA. *Id.* The court based its findings on its interpretation of similar cases where plaintiffs attempted to proceed against their insurers under the CFA, including *Price*. *Id.* *Williams* never cites or addresses *Lony* (and *vice versa*).

[123] Opening Cross-Appeal Br. at 14.

[124] *See Price*, 2013 WL 1213292, at *11 ("§ 2513(a) is inapposite because it protects consumers who are deceived while purchasing merchandise; it does not protect customers who have purchased merchandise and are seeking to receive a benefit of that purchase."); *Foraker*, 2022 WL 2452396, at *17 ("The misrepresentations in this case arise from the post-sale construction of the Voshells' custom home . . . . The sale was executed when the parties signed the Contract, which is over a year before the alleged misrepresentations."); *Lee*, 2012 WL 1415471, at *9 ("At the time [plaintiff] was presented with the consent form, [d]efendant had already taken the photographs in question. In other words, the parties had already entered into contract. Essentially, the consent form and any omission were 'post-sale' for the purposes of the Act.").

like a sale, is a type of contract[125] and is formed at a certain point in time.[126]  Therefore,

concerning the scope of the CFA, a lease is subject to the same principles that a sale is.[127]

Second, we reject the DOJ's argument because it relies on the notion that a lease

creates an ongoing relationship whereas a sale does not.  This notion is flawed because a

sale may create an ongoing relationship too.  Many of the cases above demonstrate this.[128]

And in those cases, because the defendants' behavior arose out of the ongoing, post-

transaction relationships established by agreements for the sale of services, the plaintiffs'

CFA claims were denied.  Consequently, we find this argument by the DOJ unavailing.

Third, the DOJ argues that the 2021 addition of "receipt" to Section 2513(a)

legislatively overrules the cases above and expands the scope of the CFA to include post-

transaction communications.  We disagree with this contention as well.  The General

---

[125] *See e.g. Lewes Sand Co. v. Graves*, 8 A.2d 21, 24 (Del. 1939) ("A lease is a contract by which one person divests himself of, and another takes the possession of lands *** for a term, whether long or short." (quoting Woods, Land. and Ten. 203)); *Rehoboth-By-The-Sea v. Baris*, 2015 WL 3643496, at *1 n.1 (Del. Super. June 10, 2015) ("Because the leases, which are a type of contract, were eventually assigned to Defendants, the terms of the two original leases apply to them."); *United States v. Nat'l Bank of Commonwealth*, 1990 WL 357792, at *4 n.3 (W.D. Pa. Apr. 23, 1990) ("It is well-settled case law that a lease constitutes a contractual relationship.").

[126] *See, e.g. Pearlstein v. O.M.D. II*, 1987 WL 16740, at *3 (Del. Super. Aug. 27, 1987) ("A contract is considered to be made when the final act necessary for its formation takes place."); *Miller v. Newsweek, Inc.,* 660 F. Supp. 852, 854 (D. Del. 1987) (same).

[127] Moreover it is a well-settled canon of construction that "words grouped in a list should be given related meaning," *Delaware Bd. of Nursing v. Gillespie*, 41 A.3d 423, 427 (Del. 2012) (quoting *Dole v. United Steelworkers of America*, 494 U.S. 26, 36 (1990)), so it follows that principles applied to cases interpreting sales would, at a minimum, be instructive when it comes to leases, which appears in the CFA in the same list as sales.

[128] *See Gershman's*, 558 A.2d at 1075 (involving post-sale representations pertaining to a sale creating an ongoing warranty relationship); *Price*, 2013 WL 1213292, at *11 (an ongoing insurance relationship); *Thomas*, 2003 WL 22051, at *3-4 (same); *Williams*, 631 F. Supp., at 205-06 (same); *Foraker*, 2022 WL 2452396, at *17 (an ongoing service relationship); *Dunfee*, 2016 WL 639556, at *4 (same).

35

Assembly has, on occasion, overruled judicial decisions it deems are contrary to a statute. However, in scrutinizing arguments claiming that a statutory provision has tacitly overruled standing caselaw, our courts, as a general matter, will not interpret statutes as changing the common law unless they effect the change with clarity.[129]

Here, nothing clearly suggests that the General Assembly's addition of "receipt" was intended to expand the CFA to include post-transaction communications. Moreover, we do not have to guess the General Assembly's intent with the amendment because it is stated in the synopsis:

> The act also amends § 2513(a) to add the term 'receipt,' to clarify that persons who provide goods or services at no charge to consumers — such as social media companies funded by advertising revenue — are not precluded from being held liable for engaging in consumer fraud simply because they may not directly sell or lease their goods or services to consumers.[130]

The synopsis makes clear that the addition of receipt was to clarify that the CFA applied to businesses who interacted with consumers through a different transaction type — "receipt"

---

[129] Antonin Scalia & Bryan A. Garner, *Reading Law*: *The Interpretation of Legal Texts* 318 (2012) ("[S]tatutes will not be interpreted as changing the common law unless they effect the change with clarity . . . . A fair construction ordinarily disfavors implied change."); *see also PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr., ex rel. Christiana Bank & Tr. Co.*, 28 A.3d 1059, 1072-73 (Del. 2011) ("The tenets of statutory construction require us to interpret statutes consistent with the common law unless the statutory language clearly and explicitly expresses an intent to abrogate the common law."); *Makin v. Mack*, 336 A.2d 230, 234 (Del. Ch. 1975) ("[R]epeal of common law rights and duties is not favored and is to be announced only in clear cases. It is not to be presumed that a change in the common law was intended beyond that which is clearly indicated by express terms or by necessary implication from the legislative language used." (citation omitted)).

[130] Del. H.B. 91 syn, 151st Gen. Assem., 83 Del. Laws. ch. 85, § 2.

— rather than doing so through the existing transaction types (sales or leases, and the advertisements or attempts to do so).[131]

Indeed, receipt describes a type of transaction where a company starts a relationship with a consumer for what one might colloquially call "free" rather than for traditional consideration. The synopsis gives an example of this in the form of a situation where a person signs up for an account on a social media platform free of charge. With the addition of "receipt," the CFA covers any wrongful communications the social media platform might make while courting users and signing them up, notwithstanding the fact that the user did not tender consideration to the platform in a direct or traditional fashion.

We conclude that "receipt" does not mean, as the DOJ argues, the ongoing receipt of services. Nor does it mean, in a practical sense, that the CFA is expanded to include any wrongdoing during the continued "receipt" of some kind of right or service contracted for. Such a drastic expansion likely would have been expressed clearly by the General Assembly, but it was not.

---

[131] Quite often, the General Assembly indicates in its synopsis that it intends to overrule a certain decision. *See Wife S v. Husband S*, 413 A.2d 886, 888 (Del. 1980) ("[R]evision of the Statute has not affected the meaning of incompatibility under prior Delaware case law. This conclusion is supported by the Synopsis to the 1974 Act, which makes clear that the Legislature did not intend to modify the existing definition of incompatibility."); *Bendix Corp. v. Stagg*, 486 A.2d 1150, 1153 (Del. 1984) ("[T]he General Assembly has simply not spoken on the issue before this Court today. If the General Assembly wants to so act, there is no reason to believe it will not expressly do so as it has done [in other cases.]"); *Fisher*, 2019 WL 6605863, at *10 ("When a statutory amendment intends to overrule a significant Delaware decision, the synopsis often mentions the decision by name. If the General Assembly had intended to abrogate *Riggs*, doubtless the synopsis would have said so." (citation omitted)).

Finally, as to scope, our holding today will not leave consumers without a remedy for post-transaction wrongdoing by businesses and service providers. Post-transactional issues between businesses and consumers can be, and have been, addressed by other legal avenues such as tort, contract, and statutory law. In many of the cases cited above, plaintiffs' challenges were allowed to proceed under these alternative theories despite dismissal of claims under the CFA.[132] Even here the DOJ succeeded in challenging Blue Beach's actions under the MHMHCA.[133] Therefore, for the reasons stated above, we hold that the CFA does not apply to post-transaction communications.

With this holding in mind, we now turn to the communications at issue. As we mentioned in our recounting of the facts, we strongly suspect that all but two communications (those two conceded by Blue Beach) are within the ambit of our holding and are therefore excluded from the scope of the CFA.[134] It appears that this is also the

---

[132] *See Lee*, 2012 WL 1415471, at *2-3,*9 (involving challenges based in tort and contract in addition to the CFA, with the tort claim surviving a motion for summary judgment even though the CFA claim failed); *Gershman's* 558 A.2d at 1070-71, 1076-77 (successfully surviving summary judgment with respect to multiple challenges based in contract warranty, multiple challenges based in statutes other than the CFA, and multiple negligence challenges based in tort); *Foraker*, 2022 WL 2452396 *8, *16 (challenging issues relating to who was responsible for building materials under both contract and the CFA); *Thomas*, 2003 WL 220511, at *3-6 (dismissing a CFA claim but allowing bad-faith breach contract and tortious interference claims to proceed); *Dunfee*, 2016 WL 639556, at *4 (dismissing a CFA claim, but allowing claims of breach of contract, breach of the covenant of good faith and fair dealing, professional negligence, and indemnification to proceed).

[133] A0556 (Administrative Opinion at 3).

[134] Although we have already listed them, for convenience's sake, the communications we believe are affected by our holding are as follows:

    (1) JULY 18, 2022: First "Guest License" Revocation Notice to RV Residents. A816.

    (2) FEB. 23 2023: Second Guest License Revocation Notice to RV Residents. A905.

    (3) JUNE 30, 2022: 60-Day Termination Notice to Manufactured-Home Residents. A830.

case with regard to the issue of rental payments, which was only ever addressed in the context of cross-appeal, due to the Superior Court's understanding of the CFA's scope at the time.[135]  However, it is the task of the administrative officer to make findings of fact,[136] not ours, and "[g]enerally speaking, for the purpose of affirming, reversing or modifying orders of an administrative [body], an appellate court may not intrude upon the statutory function of the [that body]."[137]  As we stated above, the Hearing Officer made no explicit findings of fact stating that the challenged communications occurred post-transaction because, at the time, he did not need to.  But that time has now come.  Although it may not be unreasonable for us to infer that the communications *were* post-transactional based on the facts that *are* in the record and make findings consistent with those inferences, "[we are] engaged in a 'substantial evidence' review of an administrative decision, not a *de novo*

---

   (4) FEB. 23, 2023:  One Year Rental Agreement Termination Notice for Manufactured-Home Residents.  A884.

   (5) MAR. 7. 2023:  Move Out Incentive Letter.  A914.

   (6) Settlement Agreements.  A907-909

Blue Beach concedes the following communications are within the scope of the CFA:

   (1) AUG.-SEPT., 2022:  Three Year Seasonal Lot License to Manufactured-Home Residents.  A818.

   (2) SEPT. 15, 2022:  "Hello!" Letter to Manufactured-Home Residents.  A829.

[135] *See Blue Beach*, 2024 WL 4977006, at *4.

[136] 6 *Del. Admin C.* § 103-22.1.2-3.

[137] *Delaware Alcoholic Beverage Control Comm'n v. Mitchell*, 196 A.2d 410, 412 (Del. 1963); *see also* 29 *Del. C.* § 2523 ("The final administrative order shall be affirmed by the [Superior] Court if the findings in the order are supported by substantial evidence."); *see Delaware Solid Waste Auth*. 250 A.3d at 105 ("When reviewing a Superior Court ruling that, in turn, reviewed the ruling of an administrative agency, this Court examines the agency's decision directly.  Thus, our review of the Board's decision matches that of the Superior Court—whether the decision is supported by substantial evidence and is free from legal error." (citation modified)).

review of the factual record in a summary judgment case[.]"[138]  Thus, we decline make

these determinations out of an abundance of caution and leave the task to the Hearing

Officer on remand.

Therefore, we **REVERSE** the finding of the Superior Court and hold that the CFA

does not apply to post-transaction communications or interactions.  We further instruct the

Superior Court to **REMAND** this matter to the administrative tribunal to make findings of

fact and accompanying conclusions of law consistent with this holding.

B.       *The CFA Does Not Violate Article I, Section 4 of the Delaware Constitution*

Blue Beach argues that the CFA violates its right to a trial by jury under Section

Four by allowing the DOJ to pursue CFA claims against Blue Beach through an

administrative proceeding provided for by statute and presided over by a deputy attorney

general.  We disagree.  Legislative enactments like the CFA receive a "strong presumption"

of constitutionality under Delaware law.[139]  "[A]ll reasonable doubts as to the validity of a

law must be resolved in favor of the constitutionality of the legislation[,]"[140] and

"[c]onstitutional prohibitions to legislative action must be shown by 'clear and convincing

evidence.'"[141]  Blue Beach does not meet this burden in its constitutional challenge of the

CFA.  An evaluation of the history and evolution of Section Four, along with case law

---

[138] *Blue Beach*, 2024 WL 4977006, at *6.

[139] *See Lamberty v. State*, 108 A.3d 1225, 2015 WL 428581, at *1 (Del. Jan. 30, 2015) (TABLE) (quoting *Sheehan v. Oblates of St. Francis de Sales,* 15 A.3d 1247, 1258 (Del.2011)).

[140] *Hoover v. State*, 958 A.2d 816, 821 (Del. 2008) (first alteration removed) (quoting *McDade v. State*, 693 A.2d 1062, 1065 (Del. 1997).

[141] *Albence v. Higgin*, 295 A.3d 1065, 1088-1089 (Del. 2022) (quoting *Sierra v. Dep't of Servs. for Children, Youth & their Families*, 238 A.3d 142, 156 (Del. 2020)).

applying it to statutory causes of action, demonstrates that, to receive Section Four's jury trial protections, a new statutory cause of action must be sufficiently analogous to a historic one that received a jury trial at common law. Based on its history, its substance, and its purpose, the cause of action created by the CFA is not sufficiently analogous to its closest comparator, common law fraud, both facially and as applied to Blue Beach. Therefore, it does not violate Section Four for lack of trial by jury.

### 1. Delaware's Law on Section Four's Jury Trial Right

In order to determine whether Section Four requires actions brought under the CFA to be tried by a jury, one must first understand Delaware's law surrounding the right to trial by jury as it pertains to new causes of action created by statute. Our analysis begins with the language of the Delaware Constitution itself, which states that "[t]rial by jury shall be as heretofore."[142] To explain the meaning of this phrase, we turn first to *Claudio v. State*, a landmark decision from this Court, which provided a detailed, historical account of Section Four.[143] In *Claudio*, this Court grappled with the issue of whether the substitution of an alternate juror after the beginning of deliberations violated the defendant's right to a trial by a jury as guaranteed by the federal and Delaware Constitutions.[144] Although an issue of jury procedure differs from the issue in the case at bar (that is, whether a new statutory action ought to receive a jury trial *at all*), *Claudio* provides a high-level

---

[142] Del. Const. art. I, §4.

[143] 585 A.2d 1278 (Del. 1991).

[144] The Court in *Claudio* observed that the right to trial by jury "is secured by the Sixth Amendment to the federal Constitution." *Id*. at 1286.

explanation of what the text of Section Four means, and it offers guidance on how Delaware courts ought to evaluate questions that might arise under Section Four.

Our Court began its discussion of the Delaware Constitution in *Claudio* by observing that it "is not a mirror image of the United States Constitution[,]"[145] and that "[t]he right to a trial by jury in the Delaware Constitution is not phrased identically to its corollary in the original federal Constitution or the federal Bill of Rights."[146] Indeed, we noted that a review of the history and origin of the right "reveals that the differences in phraseology between the Delaware and the federal right to a trial by jury are not merely stylistic."[147] Rather, there is "a significant substantive difference in that historic right, as it has been preserved for Delaware's citizens."[148]

The first Delaware Constitution, enacted on September 20, 1776, provided in Article 25 that:

> The common law of England, as well as so much of the statute law as have been heretofore adopted in practice in this state, shall remain in force, unless they shall be altered by a future law of the Legislature; such parts only excepted as one repugnant to the rights and privileges contained in this constitution and the declaration of rights, & c. agreed to by this convention.[149]

---

[145] *Id*. at 1289.

[146] *Id*.

[147] *Id*. at 1290.

[148] *Id*.

[149] *Claudio*, 585 A.2d at 1291 (emphasis removed) (quoting Del. Const. of 1776 art. 25).

As our Court in *Claudio* commented, "Delaware commenced its existence as an independent State with an unambiguous expression of its intent to perpetuate the right to trial by jury, as it had existed at common law, for its citizens."[150]

*Claudio* explains that the language of Section Four arose as a reaction to fears that late eighteenth century constitutional trends were failing to unambiguously preserve the character and accoutrements of trial by jury as it existed at common law.[151] During the nascency of the Federal Constitution, as the Union felt the need to abandon the failing Articles of Confederation, fears abounded that common law jury trial rights may be lost in the new, Federal Constitution.[152] Delaware sent Richard Bassett and John Dickinson as delegates to the 1787 Federal Constitutional Convention.[153] Bassett had a hand in inspiring Delaware's Constitution of 1776 (quoted above), which preserved jury trials as they existed common law,[154] and Dickinson supported an early Federal Constitutional draft, assuring doubters that it (the draft) perpetuated common law characteristics of the right.[155] Despite

---

[150] *Id.*

[151] *Id.* at 1296.

[152] *Id.* at 1291.

[153] *Id.*

[154] *See id.* at 1290.

[155] Article III of the proposed federal Constitution provided that "[t]he Trial of all Crimes . . . shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed." *Claudio*, 585 A.2d at 1292 (quoting *Williams v. Florida*, 399 U.S. 78, 93 (1970)). Of Article III's original provisions, Dickinson stated:

> "It seems highly probable, that those who would reject this labour of public love [the proposed Constitution], would also have rejected the Heaven-taught institution of trial by jury . . . Happily for us our ancestors thought otherwise. They were not so over-nice and curious, as to refuse blessing, because, they might possible be abused . . . Trial by Jury is our birth-right; and tempted to his own ruin, by some seducing spirit, must be the man, who in opposition to the genius of United

these assurances, worries persisted that the post-convention draft failed to adequately preserve "all of the common-law rights to trial by jury."[156] This concern served as the impetus for introducing amendments to the Constitution that eventually resulted in the Sixth and Seventh Amendments. An early draft was introduced by James Madison that explicitly mandated the recognition of common law jury principles.[157] This passed in the House, but when it returned from the Senate, it took on a "considerably altered form . . . [.] The provisions spelling out [] common-law features . . . were gone." [158] Standing in their place, was the version of federal jury trial rights that we know today, and in that formulation, "there [was] absolutely no indication in 'the intent of the Framers' of an explicit decision to equate the [United States] constitutional and common-law characteristics of the jury."[159] *Claudio* emphasized that "despite the original urging of James Madison, [and the support of involved individuals from Delaware], the effort to

---

American, shall dare to attempt its subversion . . . . In the proposed confederation, it is preserved inviolable in criminal cases, and cannot be altered in other respects, but when United American demands it." *Claudio*, 585 A.2d at 1292 (alteration in original) (emphasis removed) (quoting J. Dickinson, *Letters of Fabius, 1788,* letter IV), quoted in 1 B. Schwartz, *The Bill of Rights: A Documentary History*, 546-550 (1971).

[156] *Id*. at 1293 (emphasis removed).

[157] The original draft by Madison stated: "[t]he trial of all crimes . . . shall be by an impartial jury of freeholders of the vicinage, with the requisite of unanimity for conviction, of the right of challenge, and other accustomed requisites. . . ." *Id*. at 1293 (internal quotation marks omitted) (quoting *Williams*, 399 U.S. at 94).

[158] *See id*. at 1294 (emphasis removed).

[159] *Id*. at 1295 (second alteration in original) (emphasis removed) (quoting *Williams*, 399 U.S. at 98-9).

preserve *all* of the common law rights to trial by jury in the Federal Bill of Rights had not prevailed."[160]

In the wake of this development, Delawareans like Dickinson and Bassett were "acutely aware of the need to set forth an intention to perpetuate fundamental rights, as they had existed at common law, in unambiguous language."[161] Thus, at Delaware's 1791 Constitutional Convention, Dickinson, Bassett, and the other delegates in attendance penned Section Four, which enshrines "Delaware's unambiguous commitment to the preservation of the common law right to trial by jury. . . [,] evidenced with a 'simplicity of style.'"[162] Section Four has remained unchanged through two later constitutional revisions.[163]

With the historical review behind it, the Court in *Claudio* observed that trial by jury "as heretofore" demonstrated an "unambiguous intention to equate Delaware's constitutional right to trial by jury with the common law characteristics of that right."[164] The text of Section Four was to be construed as "guaranteeing [sic] the right to trial by jury

---

[160] *Claudio*, 585 A.2d at 1295 ("Congress had made an express decision not to preserve all of the features of the common law right to trial by jury, when it could have done so in the Sixth and Seventh Amendments to the United States Constitution.").

[161] *Id*. at 1296.

[162] *Id*. at 1297 (quoting 1 B. Schwartz, *The Bill of Rights: A Documentary History* 1068 (1971)).

[163] *Id*. at 1297 ("This language has appeared in Article I, Section 4 of the successive Delaware Constitutions – 1792, 1831, and 1897.").

[164] *Id*. at 1298.

as it existed at common law."[165]  Therefore, the evaluation of any Section Four question necessarily requires a historical analysis and examination of the common law.[166]

As stated, *Claudio's* analysis of the jury trial right arose in the context of changes to jury composition after the commencement of deliberations.  However, as a general matter, *Claudio's* historical common law analysis has been applied to other types of jury related issues, including whether an action is entitled to a jury trial at all.  In cases where the cause of action at issue is itself rooted in the common law, or is an obvious species of an action with traceable common law history, analysis under this principle is straightforward, at least in theory.  One just conducts a historical analysis to see whether the action enjoyed the right to trial by jury in the past.

Matters become more complicated when the cause of action is not a historic one with a readily evaluable history.  A statutory cause of action created in the twentieth century may not, in a literal sense, historically exist at common law, so one cannot conduct a historical analysis to see whether it, itself, received jury trial in the past.  The only thing

---

[165] *Id*. at 1297 (emphasis removed) (quoting *Fountain v. State* 275 A.2d 251, 251 (Del. 1971) ("[Section Four] guarantees the right to trial by jury as it existed at common law)).

[166] *See Claudio*, 585 A.2d at 1298.  *Claudio* itself does not literally use the terms "historical analysis," but it does say that "the proper focus of any analysis of the right to trial by jury, as it is guaranteed in the Delaware Constitution, requires an examination of the common law." *Id*.  The need for historical analysis has been subsequently stated and applied.  *See, e.g., Bon Ayre Land, LLC v. Bon Ayre Cmty. Ass'n*, 2015 WL 893256, at *4 (Del. Super. Feb. 26, 2015) ("the ultimate issue [of right to trial by jury for a particular cause of action] will always involve a historical analysis."), *rev'd on other grounds,* 133 A.3d 559, 2016 WL 747689 (Del. Feb. 25, 2016) (TABLE) (reversing the Superior Court for failure to remand the matter back to the administrative level for further fact-finding on the non-constitutional issues); *Ellery v. State ex rel. Sec'y of Dept. of Transp*. 633 A.2d 369, 1993 WL 370839, at *1 (Del. Aug. 24, 1993) (TABLE) (conducting a historical analysis of the right to jury trial *vis-à-vis* condemnation cases before 1897 to address the constitutionality of a modern condemnation of property statute).

that one could do is look to another cause of action that *did* exist at that time and see whether *it* historically enjoyed a trial by jury. But this creates a dilemma: when is it fair or appropriate to use a different older cause of action as a stand-in for the new statutory one? We discern a pattern of analysis that has emerged from our review of Delaware case law. Based upon this case law, we derive the following proposition: in these statute-based circumstances where the General Assembly has not provided for the right to jury trial, a "newly" created, statutory cause of action implicates Delaware's constitutional right to trial by jury only when it is sufficiently analogous to a cause of action to which the right to a jury at common law historically attached.[167]

This general principal involves three successive steps, with any need to analyze a succeeding step being contingent on the outcome of preceding one.

The first, and most simple step, is determining whether the General Assembly provided for a right to jury trial in the statute.[168] If the the General Assembly has provided for a jury trial right in the statute, then the inquiry simply ends there.[169] In the case of the

---

[167] *See State v. Cahill*, 443 A.2d 497, 500 (Del. 1982) (framing the question presented by asking "is the new statutory civil cause of action in substance so similar to the former [common law] cause of action that the constitutional right to a jury trial attaches?); *City of Wilmington v. Janeve Co.*, 2014 WL 2895228, at *5 (Del. Super. June 13, 2014) (finding that defendants failed to demonstrate a right to jury trial where they had "shown no common law analogue" for a statutory cause of action), *aff'd* 128 A.3d 992, 2015 WL 7352336 (Del. Nov. 19, 2015) (TABLE); *Bon Ayre*, 2015 WL 893256, at *4 (searching for (and not finding) a common law "equivalent" to a new rent control statute to determine its constitutionality, and stating: "absent a newly created statutory right to trial by jury, if the right for a particular cause of action did not exist at common law, then it does not exist today.").

[168] *See Cahill*, 443 A.2d at 499 (determining first that no right to jury trial is stated expressly or impliedly in the language or content of the statute at issue).

[169] The General Assembly may provide for a right to jury trial via statute. *See Gattis v. State*, 637 A.2d 808, 813 (Del. 1994) ("Over time, the General Assembly has by statute provided for the

CFA, it is clear, and the parties do not debate, that the General Assembly did not do so. In fact, the General Assembly did nearly the opposite — building in the very non-jury administrative hearing structure Blue Beach challenges.[170] Therefore, we move to the second step.

The second step requires a court to analyze whether the new statutory cause of action is sufficiently analogous to a cause of action at common law. It is apparent that Delaware courts, when assessing whether a statutory cause of action has a jury trial right, first analogize that new cause of action to an existing one whose common law history can be traced. We see this in cases like *State v. Cahill*, where this Court searched for "analogous" historical common law to a statutory civil non-support action covering "support for illegitimate children";[171] in *Bon Ayre Land LLC v. Bon Ayre Cmty. Ass'n* where the Superior Court ended its constitutional evaluation after it could find "no common law equivalent"

---

implementation of the right to trial by jury through various procedures and court rules."); *Bon Ayre*, 2015 WL 893256, at *4 (stating that a right to jury trial does not attach to a cause of action that didn't exist at common law, "absent a newly created statutory right[.]"); *In re Hurley*, 237 A.3d 69, 2020 WL 4333589, at *5 (Del. July 28, 2020) (TABLE) (examining the right to trial by jury in criminal contempt proceedings; stating "the defendant is entitled to a trial by jury in any case in which a statute so provides"); *c.f. Cahill*, 443 A.2d at 499 ("As we read the statute, however, there is no explicit or implicit statutory right to a trial by jury in a civil non-support enforcement action. There is nothing in the express language to suggest such a statutory right.").

[170] *See* 6 *Del. C.* § 2522(a) (granting the attorney general the power to enjoin or sanction violative conduct by an administrative proceeding, through 29 Del. C. § 2523).

[171] *Cahill*, 443 A.2d at 499. The Court in *Cahill* could not find an adequate analogy to a historic cause of action that would confer a jury trial right. It added that "[t]o the extent analogies are helpful, we feel that the new civil statutory cause of caution for the support of illegitimate children is more analogous to equitable non-jury civil support proceedings for wives and legitimate children than any other." *Id*. at 500.

48

to a rent increase justification action;[172] and in in *City of Wilmington v. Janeve Co*, where the Superior Court found "no common law analogue" despite an argument that a writ of monition was like a common law debt action.[173] If a sufficient analogy is found, we move to the third step.[174]

The third step demands the historical analysis of the analogous cause of action. If the analogous cause of action historically was tried before a jury, then its corresponding statutory cause of action also falls under the protection of Section Four.[175]

As noted, it is the second step that will be the focus of further explanation and analysis, since, as we discuss below, we do not believe that Section 2513(a) of the CFA is sufficiently analogous to its closest common law comparator (fraud) to put it within the ambit of Section Four. Consequently, we do not reach the third step's analysis of common law fraud and its historical relationship to trial by jury.

---

[172] *See Bon Ayre*, 2015 WL 893256, at *5. In *Bon Ayre*, the "Manufactured Home Owners and Community Owners Act" (coincidentally, a previous version of a pertinent act in this matter) allowed owners and tenants who could not agree on whether a rent increase was statutorily justified to bring the matter before the Delaware Manufactured Home Relocation Authority who would break the deadlock and issue an appealable decision. *Id.* at *3. When an arbitrator found appellant's proposed rent increase unjustified, appellant challenged the whole proceeding as unconstitutional under Section Four. Appellant failed in his challenge. *Id.*

[173] *Janeve*, 2014 WL 2895228, at *5 ("Defendants have shown no common law analogue to [a monition] action that carried with it a common law jury trial right, and therefore Defendants have demonstrated no right to a jury trail under the Delaware Constitution.").

[174] *See Bon Ayre*, 2015 WL 893256, at *4 (ending its constitutional analysis after determining plaintiff put forth no common law equivalent to a rent justification statute).

[175] *Cf. Money Store/Delaware, Inc. v. Kamara*, 704 A.2d 282, 283 (Del. Super. 1997) (holding that there was no right to trial by jury for a statutory mortgage foreclosure action brought in the Superior Court under 10 *Del. C.* § 5061, since a mortgage foreclosure action is historically equitable in nature.)

49

Blue Beach downplays the importance of the historical analogy aspect in Delaware's case law. It suggests that the dispositive question is whether the cause of action created by the CFA sounds in law or equity. If the former is true, then a jury trial must attach. Blue Beach addresses many of the same Delaware cases that we do, but it emphasizes the role that the distinction between law and equity played in the court's decision while minimizing the fact that those courts first asked whether the cause of action at issue was sufficiently analogous to a cause of action at common law.[176] Blue Beach then addresses the nature of fraud and argues that the legal nature of remedies sought by the DOJ is nearly dispositive of the constitutional need for a jury trial in this case. Finally, it relies upon *SEC v. Jarkesy*, a recent United States Supreme Court case wherein the plaintiff asserted a Seventh Amendment challenge against an administrative enforcement action for violations of federal anti-fraud provisions.[177] We reject Blue Beach's arguments either because we see the focus of our cases differently or because Blue Beach relies on federal precedent that diverges from our State's historical constitutional path.

In support of its argument that a matter's historical origin in a court of law or a court of equity is the key consideration, Blue Beach cites cases like *Kamara* and *Cahill*. But the fact that these cases consider law and equity does not mean that determining whether a

---

[176] *See* Opening Br. at 29-33 (citing *McCool v. Gehret*, 657 A.2d 269, 282 (Del. 1995); *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 912 (Del. 1989); *Park Oil, Inc. v. Getty Ref. & Mktg. Co.*, 407 A.2d 533, 535 (Del 1979); *Hopkins v. Justice of Peace Court No. 1*, 342 A.2d 243, 244 (Del. Super. 1975); *Allstate Ins. Co. v. Rossi Auto Body, Inc.*, 787 A.2d 742, 742 (Del. Super. 2001); *Kamara*, 704 A.2d at 283; *Cahill*, 443 A.2d at 499).

[177] Opening Br. at 39; *SEC v. Jarkesy*, 603 U.S. 109 (2024).

cause of action is legal or equitable is the only consideration. Certainly, in *Kamara* the Superior Court found that mortgage foreclosure actions brought in the Superior Court under 10 *Del. C.* § 5061 received no jury trial because mortgage foreclosure actions, being traceable to English courts of equity, historically received no jury trial.[178] But all that Section 5061 did was encompass an existing cause of action (mortgage foreclosure) and move it to the Superior Court's jurisdiction. It did not create a new cause of action, replete with its own elements, parties, and remedies. True, there was no explicit discussion in *Kamara* analogizing Section 5061 to anything, but there really did not need to be. Its relationship with a historic cause of action appears to have been relatively obvious.

Moreover, in *Cahill*, this Court did, as Blue Beach points out, state that its "new civil statutory cause of action for the support of illegitimate children [was] more analogous to equitable non-jury civil support proceedings for wives and legitimate children than any other."[179] But *Cahill* explicitly drew an analogy in that very statement, and it did so after the Court had already searched for a sufficient analogy between the cause of action at issue and a historic one at common law.[180] To be clear, we do not reject the notion that an inquiry into law or equity may be helpful in determining whether a matter receives a jury trial.

---

[178] *Kamara*, 704 A.2d at 283.

[179] *Cahill*, 443 A.2d at 500.

[180] *See id*. at 499 ("In examining a pure civil non-support enforcement action, it is clear that such an action did not exist in a non-statutory form at law"). The closest comparison we found in *Cahill* was a quasi-criminal paternity proceeding that received a jury trial under a former, repealed Act. But we held the new cause of action was not substantively similar enough to that to receive the same jury trial right. *Id*. at 500 ("We think it clear that a cause of action different in substance from the former quasi-criminal proceedings has been created.").

Indeed, if the only analogy that can sufficiently be drawn is to is a historically equitable cause of action (as suggested by *Cahill*) then it is likely that the new statutory cause of action will not receive a jury trial. But determining that an analogous historical cause of action was at equity and therefore did not receive a jury trial is more consistent with step three of the analysis we outline above. This does not change the fact that one must find a sufficient analogy in the first place. Therefore, it is clear to us that when evaluating jury-related constitutional claims, Delaware courts do not focus solely on the claim's legal or equitable nature.

Blue Beach's choice to emphasize law, equity, and remedies in the analysis is more akin to what one finds in federal jurisprudence.[181] For example, Blue Beach's relies heavily on *SEC v. Jarkesy*. In *Jarkesy*, the United States Supreme Court considered the "straightforward question" of "whether the Seventh Amendment entitles a defendant to a jury trial when the [Securities and Exchange Commission] seeks civil penalties against him for fraud."[182] It concluded that a jury trial was required.[183] Blue Beach asserts that our analysis here should be guided by *Jarkesy's* discussion of the legal nature of penalty-type remedies (which the CFA also has) and securities fraud's "close relationship" with common law.[184] We decline to follow *Jarkesy* for several reasons.

---

[181] *See Jarkesy*, 603 U.S. at 122-23 (explaining that the Seventh Amendment reaches all suits so long as they are at law and not "of equity or admiralty jurisdiction" and that to determine whether a suit is "legal in nature[,]" courts are to "consider the cause of action and the remedy it provides."

[182] *Jarkesy*, 603 U.S at 120.

[183] *Id*. at 120-121.

[184] *See* Opening Br. at 40-41.

52

First, as a high-level point, we note that the Seventh Amendment to the United States Constitution has not been incorporated and applied to the states by the Fourteenth Amendment. [185] As a result, "the right to a jury trial in civil proceedings has always been and remains exclusively protected by provisions in the Delaware Constitution."[186] Thus, *Jarkesy* is not binding on us.

Further, our Court has explicitly disavowed reliance on federal case law as it pertains to Section Four issues. We said in *Claudio* explicitly that, "it is untenable to conclude that the right to trial by jury in the Delaware Constitution means exactly the same thing as that right in the United States Constitution." [187] Our rejection was not a superficial matter based on mere issues of incorporation. Rather, it was deeply rooted in centuries of Delaware's history. As noted in *Claudio*, Delaware's decision to frame Section Four as it did was not by accident. The Federal Constitution had departed from the common law system of jury trial jurisprudence despite Delaware's urging to the contrary.[188]

---

[185] *See McCool*, 657 A.2d at 282 ("the United States Supreme Court has not held that the Seventh Amendment's guarantee of jury trials in *civil* proceedings was made applicable to the states by the incorporation doctrine with the adoption of the Fourteenth Amendment to the United States Constitution."); *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 432, (1996) ("The Seventh Amendment[] . . . governs proceedings in federal court, but not in state court.").

[186] Hon. Randy J. Holland, *The Delaware State Constitution* 44 (2d ed. 2017); *McCool*, 657 A.2d at 282.

[187] *See Claudio*, 585 A.2d at 1298; *McCool*, 657 A.2d at 281 ("[W]hen Delaware adopted its Constitution in 1792, notwithstanding the ratification of the first ten amendments or federal Bill of Rights in 1791, it did not create 'a mirror image of the United States Constitution' with regard to trial by jury." (quoting *Claudio*, 585 A.2d at 1289)).

[188] *See Claudio*, 585 A.2d at 1294-95 ("[D]espite the original urging of James Madison, the subsequent endorsement of that recommendation by the House Committee Select, chaired by Delaware's Congressman John Vining and the support of Senators, such as Delaware's Richard Bassett, the effort to preserve all of the common law rights to trial by jury in the federal Bill of

Our State's divergence from the federal path has real substantive consequences.[189] Our Court has stated that "there is absolutely no indication in 'the intent of the Framers' of an explicit decision to equate the constitutional and common-law characteristics of the jury[,]"[190] and "[a]ccordingly, the United States Supreme Court has turned to other than purely historical considerations" in answering such questions.[191] This fact is readily demonstrated by the federal method of analysis, which the United States Supreme Court has declared does not limit trial by jury "to the 'common-law forms of action recognized' when the Seventh Amendment was ratified."[192] Instead, a jury trial attaches as long as the claim is "legal in nature" (as opposed to equitable), which is evinced by the nature of the remedy sought.[193] Thus, the United States Supreme Court has noted that its own historical

---

Rights had not prevailed. Congress had made an express decision not to preserve all of the features of the common law right to trial by jury[.]" (emphasis removed)).

[189] *See id*. at 1290-91 ("A review of the history and origin of the right to trial by jury in the Delaware Constitution, vis-à-vis the history and origins of that right in the United States Constitution, reveals that the differences in phraseology between the Delaware and the federal right to trial by jury are not merely stylistic. There is, in fact, a significant substantive difference in that historic right, as it has been preserved for Delaware's citizens.").

[190] *Id*. at 1295 (quoting *Williams*, 399 U.S. at 99).

[191] *Claudio*, 585 A.2d at 1298 (citing *Williams*, 399 U.S. at 99).

[192] *Jarkesy*, 603 U.S. at 122 (quoting *Curtis v. Loether*, 415 U.S. 189, 193 (1974)).

[193] *Id*. (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989)). *Jarkesy* holds that the SEC provisions require a jury trial because the "SEC's antifraud provisions replicate common law fraud, and it is well established that common law claims must be heard by a jury." *Id*. 120. Jarkesy goes on to clarify that a "common law . . . claim[]" as used in this context, is in "contradistinction to equity[.]" *Id*. at 122. Thus, *Jarkesy* is using the term "common law . . . claims" to state, in other words, "all suits which are not of equity[.]" *Id*. (quoting *Curtis*, 415 U.S. at 193). To ensure a claim is "not of equity," it must be shown that the claim is "legal in nature," and to show *that*, federal courts are directed to "consider the cause of action and the remedy it provides." *Id*. at 122-23.

constitutional path has resulted in diminished federal reliance on historical common law in the area of jury-related questions.[194]

By contrast, "[t]he history of the right to trial by jury 'as heretofore,' which has remained unchanged in the Delaware Constitution since 1792, demonstrates an unambiguous intention to equate Delaware's constitutional right to trial by jury with the common law characteristics of that right."[195] Thus, the measure of a jury trial for Delaware *is* the common law, not the remedy sought, and historical analysis is required to determine whether a cause of action existed in that form.

*Jarkesy* is a federal case, and its conclusions are grounded in an analysis focused foremost on remedies, not the common law.[196] *Jarkesy* is the product of a different system with different priorities and principles from which, as we explained above, Delaware consciously departed. As a result, *Jarkesy* does not dictate the outcome here.

It is for substantially the same reasons that we also decline to accept Blue Beach's contention that *Jarkesy*'s likening of securities fraud to common law fraud should be relied upon in our own analogizing of the CFA. In the federal landscape, "characterizing the relief sought is '[m]ore important' than finding a precisely analogous common-law cause of action."[197] Although it is true that *Jarkesy* finds a "close relationship" between common

---

[194] *See Williams*, 399 U.S. at 92 ("[T]he relevant constitutional history casts considerable doubt on the easy assumption in our past decisions that if a given feature existed in a jury at common law in 1789, then it was necessarily preserved in the Constitution.").

[195] *Claudio*, 585 A.2d at 1298.

[196] *Jarkesy*, 603 U.S. at 123 ("In this case, the remedy is all but dispositive.").

[197] *Tull v. United States*, 481 U.S. 412, 420-21, (1987) (quoting *Curtis*, 415 U.S. at 196).

law fraud and securities fraud, it examines the issue through a lens where the primary focus is on whether the remedy of the securities fraud statute is legal or equitable in nature. The answer to that question was "all but dispositive."[198] The fact that securities fraud was like common law fraud served in *Jarkesy* as ancillary support for a conclusion it had already made.[199]

By contrast, in Delaware, the relationship between common law fraud and the CFA is not an incidental point. It is a critical one. Because Delaware's jury trial right is *defined* by the common law, "reference *must always* be made to common law to properly interpret the meaning of the present constitution."[200] Thus, when looking at a new statutory cause of action, analogy is very important, since analogy is the only thing that can ground a new statute in historical common law, and, consequently Section Four.

For these reasons, this Court rejects Blue Beach's arguments concerning Section Four, and, in the succeeding section, we will analyze the CFA consistent with our discussion above.

---

[198] *Id*. at 123.

[199] *Id*. at 125 ("In sum, the civil penalties in this case are designed to punish and deter, not to compensate. They are therefore 'a type of remedy at common law that could only be enforced in courts of law.' That conclusion effectively decides that this suit implicates the Seventh Amendment right, and that a defendant would be entitled to a jury on these claims.") (quoting *Tull*, 481 U.S. at 422).

[200] *Claudio*, 585 A.2d at 1297 (most emphasis removed) (quoting *Documents of the Constitution Revision Commission,* Commentary on the Proposed Constitution, Proposed Section 1.02 (1969)).

### 2. The CFA Does Not Violate Section Four Because it is Not Sufficiently Analogous to Common Law Fraud.

The CFA does not violate Section Four of the Delaware Constitution because it is not sufficiently analogous to common law fraud to require a trial by jury. The CFA and common law fraud differ in multiple ways including history, substance, and purpose.

In order for a statutory cause of action to require a jury trial under Section Four, it must be sufficiently analogous to a cause of action which received a jury trial at common law. Blue Beach contends that the CFA is similar to common law fraud, which was historically accompanied by a jury trial. We disagree and conclude that the CFA is not sufficiently analogous to common law fraud to require a jury trial.

Consistent with what we refer to in our "second step," Delaware courts have evaluated constitutional challenges to new statutory causes of action by analogizing them to common law comparators. *Claudio* explains that Section Four arose from a strong desire to preserve the right to jury trial as it existed at common law after the federal constitution departed from that goal.[201] Because of this, the text of Section Four "demonstrates an unambiguous intention to equate Delaware's constitutional right to trial by jury with the common law characteristics of that right."[202] Therefore, unlike jury trial issues surrounding the federal Seventh Amendment, our law requires a direct comparison to the common law.[203]

---

[201] *Claudio*, 585 A.2d at 1296.

[202] *Id*. at 1298.

[203] *Id*. at 1297.

57

Before addressing the specific question of whether the CFA is sufficiently analogous to common law fraud, it is helpful to first look at the limited instances where statutory causes of action were compared to common law ones for the purpose of determining jury trial rights under Section Four. Such rights have been found to attach in cases where the statute, as demonstrated by its purpose or substance, essentially encompassed the common law or had a direct linage to it, sometimes "extinguish[ing]" or "express[ly] repeal[ing]" its ancestor.[204]

For example, in *Hopkins v. Justice of Peace Court No. 1*, the Superior Court analyzed the right to jury trial as it pertained to the enactment of the 1972 Landlord-Tenant Code. *Hopkins* involved a provision governing what actions under the Code qualified for summary possession hearings.[205] The new Code's purpose was "'to simplify and clarify the law governing landlord and tenant relationships,' and * * * 'to revise and modernize the law of landlord and tenant.'"[206] In service of that purpose, the new statute repealed an existing "Entry, Detainer, and Holding Over" statute which provided for trial of factual issues by jury, instead mandating that such matters be dealt with through a juryless summary possession proceeding in the Justice of the Peace Court.[207] The court, through a historical analysis, demonstrated that the cause of action which the 1972 Act affected "had

---

[204] *Hopkins*, 342 A.2d at 244.

[205] *Id*.

[206] *Id*. at 245 (quoting 58 Del. Laws ch. 472, § 5102 (1972)).

[207] *Id*.

governed tenant eviction proceedings with minor modification since 1852."[208]  This 1852 action was itself a directly traceable descendant of eighteenth century common law ejectment, being first codified from common law in 1793.  Thus, there was a direct line between historic ejectment and the 1972 Act. [209]  Through every minor change from the eighteenth century to 1852, the right to jury trial was provided for in some form.  All the 1972 Act had done, was "permit a summary proceeding to embrace a claim for debt or for money damages, matters historically triable before a jury."[210]  It was "clear from the history of the repossession statute that its origin [laid] in the common law action of ejectment." [211] Thus, the court in *Hopkins* rejected respondent's argument that the 1972 Act was "new and distinct" and found that the 1972 Act did little more than to absorb the common law and "modernize" it by removing a jury trial in an attempt to streamline the adjudicative process.[212]  Ultimately, the court in *Hopkins* issued a writ of prohibition preventing petitioner's landlord from prosecuting a landlord tenant action in the juryless Justice of the Peace Court.[213]

Similarly, in *Allstate Ins. Co. v. Rossi Auto Body, Inc.,* plaintiff challenged a statute which put replevin actions in garageman lien cases within the original jurisdiction of the

---

[208] *Id.* at 244-45.

[209] *See Hopkins*, 342 A.2d at 245.

[210] *Id.* at 246.

[211] *Id.* at 245.

[212] *See id.* at 246.

[213] *Id.* at 247.

Justice of the Peace Court.[214]  Once again, the Superior Court traced the lineage of the modern statute back through history, demonstrating that it was an evolution of previous replevin-related jurisdiction-granting statutes, which all preserved the right to a jury trial.[215] The current statute had done little more than take the action out of the jurisdiction of a court which provided a jury trial and put it into one which did not.  To this end, the fact that it now eliminated trial by jury was unconstitutional.[216]

Finally, a similar set of circumstances occurred in *Money Store/Delaware, Inc. v. Kamara*.  There, unlike the previous two cases, the court ultimately determined that no jury trial attached because the analogous action, mortgage foreclosure, was historically equitable in nature.[217]  Notably though, the court seems to have taken it for granted that the action, though technically brought under statute, was simply equitable mortgage foreclosure codified, since all the statute did was take the cause of action and put it within the Superior Court's jurisdiction.[218]

In this case, unlike the cases above, the CFA is not simply a descendant or codification of common law fraud.[219]  In fact, its lineage is not rooted in common law fraud

---

[214] *Allstate*, 787 A.2d at 743.

[215] *Id*. at 743-748.

[216] *Id*. at 750.

[217] *Kamara*, 704 A.2d at 283.

[218] *Id*.

[219] *State ex rel. Brady v. Publishers Clearing House*, 787 A.2d 111, 116 (Del. Ch. 2001) ("Both the CFA and the UDTPA stem from the 1914 Federal Trade Commission Act and its later amendment in 1938.  They are consumer protection laws and remedies for unfair competition, not simply codified versions of common law fraud.").  There, the Court of Chancery held that "claims by the Attorney General brought under the CFA or the UDTPA are not sufficiently analogous to claims for common law fraud to justify the application of Rule 9(b)'s heightened pleading standard.  *Id*.

at all.  It derives from consumer protection and unfair trade practice principles that did not exist at common law and which stem from distinguishable, antitrust law of the early twentieth century.[220]  To the extent that common law fraud bears any resemblance to the CFA, it is not in its historical origin, but rather, it is in the interpretation of certain shared general legal concepts like fraud and deceit.[221]

Further, the CFA does not merely replicate common law fraud with certain alterations to jurisdiction or adjudicative process.  It does not simply shift jurisdiction of the cause of action to another court with no substantive changes to the action itself, as was the case for the statute in *Kamara*, and it does not have a purpose of merely modernizing or revising an existing system where a jury trial did exist like the statute in *Hopkins* did. Instead, the purpose of the CFA is new and specific, endeavoring to "protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this State."[222]

---

at 116.  The court further observed that "the two actions are quite distinct," and that "[s]cienter, intent to induce action, reliance, and damages are conspicuously missing from the elements of the CFA." *Id*.

[220] The history of the CFA as it relates to unfair trade practices and consumer protection law deriving from antitrust is explored in detail by *amici curiae*, CLASI and the Delaware Manufactured Home Owners Association ("DMHOA"), in their brief.  *See* Brief of Amici Curiae of Appellee [hereinafter *Amici* Br.] at 10 (exploring how laws originating with the FTC, that were created in response to unfair trade practice and antitrust concerns, grew to protect consumers and disseminated to the states as they worked in tandem with the federal government to this end.  These laws further evolved in their respective state versions to become modern state statutes like the CFA).

[221] *See Stephenson v. Capano Dev*., *Inc*., 462 A.2d 1069, 1074 (Del. 1983) ("In all other respects, however, the [CFA] must be interpreted in light of established common law definitions and concepts of fraud and deceit.").

[222] 6 *Del*. *C*. § 2512.

The CFA's distinct purpose is reflected in meaningful substantive alterations that are intended to "make[] it easier to establish a claim for consumer fraud than common law fraud."[223] "These statutory changes from the common law make the burden on the State relatively light, and require a limited amount of proof to satisfy the Act's mandates."[224] The changes serve as more support—in addition to the statute's history—to further differentiate the CFA from common law fraud.

These substantive variations between Section 2513(a) of the CFA and common law fraud are best reflected in the actions' elemental requirements. And indeed, the actions' differences in this respect are "remarkabl[e]."[225] Under Section 2513(a), the DOJ must prove:

(1) "The act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice[;]" or

(2) "[T]he concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression, or omission[.];

and

(3) That either (1) or (2) was done "in connection with the sale, lease, receipt, or advertisement of any merchandise[.]"[226]

---

[223] *Washington v. William H. Porter, Inc.*, 2017 WL 3098210, at *5 (Del. Super. July 20, 2017).

[224] *State ex rel. Brady v. Gardiner*, 2000 WL 973304, at *5 (Del. Super. June 5, 2000), *aff'd*, 781 A.2d 696, 2000 WL 33321912 (Del. May 10, 2001) (TABLE).

[225] *Publishers Clearing House*, 787 A.2d at 116 ("Common law fraud differs remarkably from 'statutory fraud' under the CFA.").

[226] Broken down and organized into elements from the text of 6 *Del. C*. § 2513(a), which, states: "The act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection

Additionally, under the same section, the DOJ need not prove that the victim of any deception, *et seq.* was *actually* misled, deceived or damaged thereby.[227]

Common law fraud, by contrast, requires:

"(1)  the defendant falsely represented or omitted facts that the defendant had a duty to disclose;

(2)  the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth;

(3)  the defendant intended to induce the plaintiff to act or refrain from acting;

(4)  the plaintiff acted in justifiable reliance on the representation; and

(5)  the plaintiff was injured by its reliance."[228]

As is readily apparent, establishing common law fraud is more burdensome, and requires proof of more elements than the CFA does.  The CFA does not require scienter, intent to induce action, reliance, or even damages.[229]  As a result, the *only* attribute the two causes of action share is the initial showing of false representation,[230] and, as the DOJ points out in its briefing, "even a false representation is not always required, as a CFA

---

with the sale, lease, receipt, or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is an unlawful practice." 6 *Del. C.* § 2513(a).

[227] *Id*.

[228] *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005).  We preserve the original language, numbering, and punctuation from *DCV*, but reformat for clarity.

[229] *Publishers Clearing House*, 787 A.2d at 116 (conducting the same analysis and refusing to extend Chancery Rule 9(b)'s heightened pleading standard to the CFA, highlighting the "remarkable" dissimilarity to common law fraud).

[230] *Washington*, 2017 WL 3098210, at *5 ("Under the DCFA, (i) a negligent misrepresentation is sufficient to violate the statute, (ii) the plaintiff need not demonstrate actual reliance, and (iii) the plaintiff need not prove the defendant's intent to induce action/refraining from action.  If a plaintiff cannot at least prove the existence of a negligent misrepresentation, the plaintiff cannot make out a claim under the DCFA.").

violation may be based on an unfair practice, which is foreign to common law and does not require misrepresentation."[231] By virtue of the expansion of the set of circumstances under which a defendant may be subject to penalty, the CFA demonstrates its unique features centered around its unique purpose, and further distances itself from common law fraud.

Blue Beach addresses these differences by arguing (mostly in its Reply Brief) that it challenges the CFA *as applied* to itself (Blue Beach) in light of the specific claims made by the DOJ. Putting aside the fact that Blue Beach did not unambiguously raise its "as-applied" challenge until its Reply Brief,[232] we nevertheless think Blue Beach fails on this front.

Blue Beach argues that, based on the nature of the DOJ's claims, the DOJ was required to prove more of the elements of common law fraud than the CFA generally

---

[231] Opening Cross-Appeal Br. at 37 (citing 6 *Del. C.* § 2511(9) (listing the elements of an unfair practice)).

[232] The first time Blue Beach specifies that its argument is "as-applied" in its submissions to this Court is on page fourteen of its Reply Brief on appeal. Reply Br. at 14. There, it cites to a line making the same assertion in its answering supplemental briefing to the Superior Court below, which in turn tries to support itself on broad sweeping citations to general page ranges comprising the greater parts of Blue Beach's constitutional arguments in the rest of its Superior Court briefing. A1280 (Appellant's Answering Supplemental Br. at 10, *Blue Beach*, 2024 WL 4977006 (No. S24A-05-001) (citing Appellant's Opening Br. at 41-42, *id*; Appellant's Reply Br. at 22-24, *id*; Appellant's Supp. Opening Br. 1-2, 16-18, *id*.)). Within these broad page ranges, the notion that Blue Beach is making an as-applied argument is not explicit but is apparently meant to be inferred. At the appellate level, Blue Beach never mentions that the challenge is "as-applied" in its Opening Brief, at most characterizing its argument to be one about the overstated differences between the elements of common law fraud and the "DOJ's CFA claims." *See* Opening Br. at 43. Further, given the points of emphasis Blue Beach opts for in its Opening Brief, and the nature of Blue Beach's cited caselaw (which all concern facial challenges and which Blue Beach does not distinguish on that basis), it is certainly not difficult to interpret Blue Beach's argument as purely facial. Arguably, the DOJ, the Superior Court, and *Amicus* all interpreted it that way. Blue Beach's as-applied argument, to our eyes, is ambiguous and subject to a finding of being waived, but we will, nonetheless, address the as-applied challenge here.

64

demands. This, Blue Beach contends, imposes a burden more congruent with common law fraud, negates any meaningful difference between common law fraud and the CFA, and results in special circumstances where a jury right is warranted.[233] Blue Beach asserts that the DOJ's claims against it required the DOJ to argue three additional elements of common law fraud, meaning that in this case, the CFA and common law fraud only differed in one elemental respect (that being "reasonable reliance," which Blue Beach concedes is not generally required by the CFA, nor pled under the DOJ's claims).[234]

Blue Beach points out that the DOJ "sought monetary penalties for 'willful' violations" of the CFA under 29 *Del. C.* § 2524,[235] and so it (the DOJ) had to basically demonstrate common law fraud's scienter element by proving that "Blue Beach knew or should have known that its conduct was prohibited by the CFA."[236] But any extra elemental similarities in Blue Beach's as-applied case start and stop there. All of Blue Beach's other attempts to show additional common law fraud elements in the DOJ's claim fall flat.

First, Blue Beach argues that, although the DOJ was not required to prove intent to induce action or inaction (as mandated by common law fraud), it was required to prove that Blue Beach concealed, suppressed, or omitted facts with the intent that Pine Haven residents rely on those concealments, suppressions, or omissions.[237] We are not convinced

---

[233] *See* Reply Br. at 21-23.

[234] *Id*.

[235] *Id*. at 22 (citing 29 *Del. C.* § 2524 (limiting damages to $5,000 per willful violation of the CFA that is adjudicated in an administrative proceeding)).

[236] *Id*. (citing A33-34 (DOJ Administrative Complaint at 22-23).

[237] *Id*.

this is true. It is not clear whether the DOJ *was*, in fact, required to prove that Blue Beach omitted facts with the intent that Pine Haven residents rely on such omissions. This is because it is unclear whether the DOJ even alleged such a theory. We note that the Superior Court found that the DOJ did not plead that Blue Beach committed acts of omission with intent that residents rely on them.[238] We are not persuaded that the DOJ was required to prove common law fraud's intent to induce action element.

Second, Blue Beach argues that the DOJ had to prove damages because it "alleged that residents were harmed by Blue Beach's illegal conduct and requested that the Hearing Officer order Blue Beach to pay restitution to each resident harmed."[239] Blue Beach is correct that the DOJ was required to show damage to the "plaintiff" in order to effect proper restitution.[240] However, what Blue Beach fails to observe is that the DOJ did not allege this in connection with its CFA claims. It alleged damage in connection with its claims under the MHMHCA, where it eventually achieved the restitution it sought.[241] Therefore,

---

[238] *Blue Beach*, 2024 WL 4977006, at \*8. "[T]he Hearing Officer based his finding of a CFA violation, and his ordered rebate of the illegal portion of those rent payments, on Appellant's *omission* by accepting, rather than declining, excessive rent payments, rather than on Appellee's charge of Appellant's *commission* by claiming that tenants were required to pay excessive rent payments. Thus, I find that the Hearing Officer's findings with respect to the collection of rents were based on violations not charged by Appellee in its Complaint.").

[239] Reply Br. at 23 (citing A42 (DOJ Administrative Complaint at 31)).

[240] *Id*.

[241] A628 (Administrative Opinion at 75). Blue Beach cites a few statements by the DOJ to support its assertion that the DOJ argued harm and/or requested restitution, Reply Br. at 23 n.12., but in none of those statements does the DOJ make such arguments under the CFA. First, Blue Beach incorrectly cites (11 pages from the actual quote) the DOJ's Pre-Hearing Reply Memorandum where the DOJ states that "the harm [Blue Beach caused to Pine Haven] residents is palpable and real." A279 (Respondent's Pre-Hearing Reply Memorandum at 13). But this statement is a non-substantive comment about the "offensive" nature of Blue Beach's argument that its behavior "did no harm to Pine Haven residents." *Id*. In fact, the immediate context surrounding the quotation

we are not persuaded that the DOJ was required to prove a harm element under its CFA claim against Blue Beach either.

Finally, we note that common law fraud is brought by a victim-plaintiff, who seeks to make themselves whole through damages. Here the CFA was enforced by the State, which is seeking civil penalties that are deterrent in nature.[242] Therefore, for all these reasons, we find that the CFA is not sufficiently analogous to common law fraud and does not require a jury trial under Section Four. We **AFFIRM** the decision of the Superior Court on this issue.

### C. The DOJ's Cross-Appeals

On cross-appeal, the DOJ argues three points: (i) the Superior Court erred when it determined the Hearing Officer committed legal error in finding that the June 30 and July 18 letters violated the CFA; (ii) the Superior Court erred when it determined the Hearing Officer committed legal error in finding Blue Beach violated the CFA by accepting

makes clear that the DOJ is not making an argument about harm or damages under the CFA. Instead, the DOJ states that harm is "irrelevant" to the CFA, and that "harm is not an element of an offense under [] the [CFA]." *Id*. Shortly afterwards, the DOJ makes a general prayer for the "relief requested" with no specific mention to the CFA. *Id*. Second, Blue Beach asserts that a certain section of the DOJ's Post-Hearing Memorandum demonstrates that the DOJ sought restitution in connection with the CFA. *See* Reply Br. at 23 n.12 (citing A479-85 (Respondent's Post-Hearing Memorandum at 32-38)). However, the DOJ merely describes the harm done to Pine Haven residents and asks for restitution "[p]ursuant to 29 *Del. C.* § 2524(b)[.]" This code section does not show that the DOJ was arguing harm or seeking damages under the CFA, as it is the section that outlines the administrative remedies the DOJ can award for *multiple* statutes under its administrative umbrella, including the MHMHCA, under which the DOJ did ultimately prevail. *See* 29 *Del. C.* § 2523(a), (c). Finally, Blue Beach cites the conclusion section of the DOJ's Post-Hearing Reply Brief, which does not mention the CFA and only contains a general statement that Blue Beach's behavior was harmful to Pine Haven residents, followed by a general prayer for relief. *See* A508 (Respondent's Post-Hearing Reply Memorandum at 22).

[242] *See* 6 *Del. C.* § 2522(a); 29 *Del. C.* § 2524(b).

unlawful rent payments; and (iii) the Superior Court erred when it found that the Hearing Officer lacked sufficient evidence to find the February 23 letter violated the CFA.[243]

As we have explained above, all the communications to which the DOJ's cross-appeal pertain are within the ambit of our ruling that the CFA does not reach post-transaction communications. That holding is likely dispositive of the issues on cross-appeal, which only remain at play if the communications that underly them are within the CFA's scope. Because it is likely that this is no longer the case, we see no need to discuss those issues any further.

*CONCLUSION*

For the reasons set forth above, we hold that: (1) post-transaction communications are not within the scope of the CFA; and (2) the CFA is constitutional under Article I, Section 4 of the Delaware Constitution both facially and as-applied to Blue Beach. We **REMAND** the matter to the Superior Court, with instructions that it further remand the matter to the Hearing Officer to make any new findings consistent with our opinion.

---

[243] *See* Opening Cross-Appeal Br. at 45, 57, 61.